IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ROBERT WALKER AND | ) | |
| BRANDY NEWSOM | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.  17-CV-752-D |
| | ) | |
| USAA CASUALTY INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS
<u>AND BRIEF IN SUPPORT</u>**

Jodi W. Dishman, OBA # 20677
McAfee & Taft A Professional Corporation
211 North Robinson, 10th Floor
Oklahoma City, OK  73102
Telephone:   (405) 235-9621
Facsimile:   (405) 235-0439
E-mail:        jodi.dishman@mcafeetaft.com

-and-

William S. Leach, OBA # 14892
Anna Imose, OBA # 32021
McAfee & Taft, A Professional Corporation
Williams Tower II
Two West 2nd Street, Suite 1100
Tulsa, OK  74103
Telephone:   (918) 587-0000
Facsimile:   (918) 599-9317
Email:        bill.leach@mcafeetaft.com
                anna.imose@mcafeetaft.com

ATTORNEYS FOR DEFENDANT USAA
CASUALTY INSURANCE COMPANY

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    UNDISPUTED MATERIAL FACTS ("UMF") ...................................................... 4

       A.     USAA CIC issued the Policy to Plaintiffs on the property .......................... 4

       B.     Within a month of its issuance, Plaintiffs submitted a claim under the
              Policy ............................................................................................ 6

       C.     Within four months of its issuance, Plaintiffs submitted a second claim
              under the Policy that USAA CIC investigated and paid within 23 days ...... 6

       D.     After payment, Walker submitted additional claimed damages as claim-
              related and SIU denied the additional claimed damages ........................... 10

       E.     Plaintiffs filed this lawsuit and asserted a new cause of loss, and discovery
              revealed additional relevant information ................................................. 13

III.   ARGUMENT AND AUTHORITIES .................................................................... 16

       A.     USAA CIC is entitled to summary judgment on Plaintiffs' breach of
              contract claim ............................................................................. 16

              1.     USAA CIC paid the claim-related loss insured by the Policy as
                     presented during the claim before litigation.................................... 16

              2.     Plaintiffs have no admissible evidence that any additional claimed
                     damages are covered by the Policy or owed by USAA CIC ........... 18

              3.     Recasting the claim in suit should not get Plaintiffs before a jury as
                     Walker made material misrepresentations to procure the Policy..... 21

       B.     USAA CIC is entitled to summary judgment on Plaintiffs'
              bad faith claim ........................................................................... 23

              1.     Plaintiffs cannot satisfy their burden of creating a triable fact issue
                     on coverage or payment ................................................................. 23

              2.     Plaintiffs' bad faith claim reveals a legitimate dispute ................... 24

       C.     No evidence warrants submission of punitive damages to the jury ........... 28

IV.    CONCLUSION ................................................................................................ 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Agrawal v. Farmers Ins. Co.*,
No. 11-CV-087-GKF-TLW, 2012 WL 124547 (N.D. Okla. Jan. 17,
2012) ................................................................................................................ 30

*Am. Economy Ins. Co. v. Rutledge*,
833 F. Supp. 2d 1320 (W.D. Okla. 2011) .................................................... 17

*Ball v. Wilshire Ins. Co.*,
2009 OK 38, 221 P.3d 717 ............................................................................ 24

*Christian v. Am. Home Assur. Co.*,
1977 OK 141, 577 P.2d 899 .......................................................................... 24

*Coonce v. CSAA Fire & Cas. Ins. Co.*,
748 F. App'x 782 (10th Cir. 2018) ............................................................... 24

*Dodson v. St. Paul Ins. Co.*,
1991 OK 24, 812 P.2d 372 ............................................................................ 17

*Emmanuel Baptist Church v. State Farm Fire & Cas. Co.*,
No. CIV-11-594-D, 2012 WL 3595093 (W.D. Okla. Aug. 21, 2012) ........ 24

*Errahmouni v. Progressive N. Ins. Co.*,
No. CIV-12-1380-HE, 2013 WL 6410985 (W.D. Okla. Dec. 9, 2013) ....... 28

*Estrada v. Port City Props., Inc.*
2011 OK 30, 258 P.3d 495 ...................................................................... 28, 29

*Harris v. Progressive Direct Ins. Co.*,
740 F. App'x 900 (10th Cir. 2018) .......................................................... 24, 28

*Hobbs v. Prudential Property & Cas. Co.*,
1993 OK CIV APP 76, 853 P.2d 252 ....................................................... 22, 23

*Long v. Ins. Co. of N. Am.*,
670 F.2d 930 (10th Cir. 1982) ...................................................................... 23

*McLaughlin v. Nat'l Ben. Life Ins. Co.*,
   772 P.2d 383, 1998 OK 41 ........................................................................ 29

*Newman v. State Farm Fire & Cas. Co.*,
   290 F. App'x. 106 (10th Cir. 2008) .......................................................... 25

*Phillips v. Calhoun*,
   956 F.2d 949 (10th Cir. 1992) .................................................................. 20

*Willis v. Midland Risk Ins. Co.*,
   42 F.3d 607 (10th Cir. 1994) .................................................................... 29

## Statutes

Okla. Stat. tit. 23, § 9.1(B) ............................................................................ 29

# I. <u>INTRODUCTION</u>

This is Plaintiffs' home as it existed at the time of the claim at issue in this litigation:



Shortly after procuring a USAA CIC homeowners' policy, on September 25, 2016, Robert Walker presented USAA CIC with a claim for water damage from a backup from the kitchen sink and dishwasher that occurred while Plaintiffs were out of town. This was the second claim Walker made within four months of obtaining the policy.

The claim presented some oddities. For example, USAA CIC's independent adjuster Ben Phillips noted the home was in poor shape, Plaintiffs had submitted two claims within months of the policy being issued, and Walker appeared to be looking for home maintenance. During Phillips' inspection of the home with Walker, he saw no visible water damage to the exposed subfloor. This is despite Walker telling USAA CIC when he

reported the claim that he needed to immediately remove the carpet because it was "ruined" with water, and Walker testifying that when he first discovered the loss, he could "feel liquid" under the flooring when walking. Also during the inspection, Walker asked Phillips to include amounts in the estimate for damage to the living room caused by a ruptured fish tank that had nothing to do with the water backup.

Walker asked to be reimbursed for hauling five loads of debris to the city landfill, but based on the size of the home and scope of damage, Phillips could not see how more than two trips were warranted. Walker also asked for $1,200 to replace the carpet, a disproportionately high amount given the small square footage and the lower-end quality of the other home amenities.

Walker also submitted for reimbursement a receipt for items purchased to remove the flooring that was dated October 11, 2016. However, when Walker reported the claim on September 25, 2016, he indicated he was removing the damaged carpet that night. Moreover, Walker testified that he removed all the damaged flooring the night they discovered the loss and completed this the early morning hours of September 26, 2016.

Despite the odd issues with the claim, USAA CIC processed and paid it quickly. Within 30 days of the notice of loss, USAA CIC estimated damages in the amount of $3,928.55 and issued a payment to Plaintiffs for $1,928.55, which was less the Plaintiffs' deductible. During this time, Walker gave USAA CIC the "thumbs up" sign, and thanked USAA CIC for "guiding [him] flawlessly" through the claims process.

Walker, however, subsequently sought additional damages he claimed were related to the water backup. He claimed that the water backup damaged the kitchen countertops and

2

flooring in the storage room. The kitchen countertops, which are designed to sustain water exposure, showed the damage Walker attributed to the claim was long term. The invoice from the plumber submitted as the repair bill did not indicate any damage that would cause water to overflow onto the kitchen countertops. During the inspection, Walker stated there was no storage room flooring at the time of the loss.

USAA CIC denied the additional damages after an SIU investigation. Plaintiffs then sued USAA CIC for breach of contract and bad faith, asserting for the first time in litigation that the cause of loss was a blackwater sewage backup. UMF 44. Discovery has only revealed more oddities. For example, Plaintiffs told USAA CIC that the flooring in the home at the time of the loss was from Allison's Flooring. However, Allison's Flooring's records show Plaintiffs purchased flooring but then returned it and received a cash refund. Records for use of the city's landfill show Plaintiffs did not use it in the month following the loss, despite Walker stating he made three trips to the landfill in the two weeks following the loss. The deed for the home as of May 2016 does not contain Plaintiffs' names, but Walker told USAA CIC when he applied for the policy that Plaintiffs' names were on the deed. Walker testified that the plumber's invoice he submitted and told USAA CIC identified the cause of the water backup and the plumber's related repair was actually for an unrelated previous incident.

Plaintiffs' claims fail because they cannot prove coverage, an essential element of each claim. As to the breach of contract claim, within 30 days of the claim's submission, USAA CIC paid Plaintiffs for all claim-related and covered damage. USAA CIC cannot have breached the policy for not paying the additional claimed damages that were not

damaged by the water backup, and, therefore, are not covered and not owed. Likewise, USAA CIC cannot have breached the Policy for not paying damages resulting from a sewage backup that Plaintiffs assert for the first time in this litigation was the cause of loss, and more importantly, did not occur. Plaintiffs have no competent evidence to support their new cause of loss theory. The competent evidence shows it is a physical impossibility that sewage backed up into the home and came out the kitchen sink.

As to the bad faith claim, it fails because Plaintiffs have presented no competent evidence that there is coverage or payment owed for the additional claimed damages and Plaintiffs' newly asserted, unproven, and physically impossible cause of loss. Plaintiffs' bad faith claim also fails because it is not bad faith for an insurer to raise legitimate disputes about a claim, especially when the dispute arises from Plaintiffs' ever-changing story about the cause of loss and scope of covered damage. Summary judgment is proper.

## II.   UNDISPUTED MATERIAL FACTS ("UMF")

**A.   USAA CIC issued the Policy to Plaintiffs on the property.**

1.     On May 14, 2016, Walker applied for a USAA homeowners' policy on the property over the phone with a member services representative ("MSR"). Ex. 1, Affidavit of Sandra Sausman at ¶¶ 6-7. Walker was asked questions about the home's physical characteristics, occupancy, and his proof of legal title. *Id.* ¶ 8.

2.     USAA's homeowners' insurance for a primary residence is not available to members who occupy the home but do not have proof of legal title. One of the easiest ways to confirm proof of title is to ask whether the member's name is on the deed. *Id.* ¶¶ 3-4.

3.      The MSR asked who owned the home and Walker answered Plaintiffs. *Id.* ¶ 9. The MSR asked whose name(s) appear on the home's deed, and Walker answered Plaintiffs. *Id.* ¶ 10.

4.      In accordance with USAA's practice, USAA did not confirm Walker's representation that Plaintiffs had proof of legal title because he represented their names were on the deed for the home. *Id.* ¶¶ 5, 11.

5.      If Walker's response to ownership questions had revealed neither he nor Newsom had proof of legal title to the property, USAA would have declined to issue the Policy. *Id.* ¶¶ 3, 5, 10, 12-13.

6.      Based on the information provided by Walker, USAA CIC issued a homeowners policy to Plaintiffs, Policy No. CIC 00553 21 76 90A, effective May 15, 2016, to May 15, 2017 (the "Policy"). *Id.* ¶ 12; Ex. 2, Policy, USAA-00001-00052.

7.      Under the Policy, USAA CIC "insure[s] against 'sudden and accidental', direct, physical loss to" the property resulting from "[d]ischarge or overflow of water . . . from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance."  Ex. 2, USAA-00023. "This peril does not include loss . . . [t]o the system or appliance from which the water escaped . . . ."  *Id.* "'Sudden and accidental' means an abrupt, fortuitous event which is unintended from the perspective of a reasonable person." *Id.* at USAA-00011.

8.      Under the Policy, USAA CIC pays the lesser of the actual cash value, USAA CIC's cost to replace the property with property of like kind, quality, age and condition, or

USAA CIC's cost to repair or restore the property to the condition it was in just before the loss. *Id.* at USAA-00027.

9.     The Policy contains a Concealment, Misrepresentation or Fraud provision that provides that if the insured, either before or after a loss has intentionally concealed or misrepresented any material fact or made false statements which if known by the carrier would have caused it not to issue the policy, coverage may be denied or the Policy voided. *Id.* at USAA-00032.

**B.     Within a month of its issuance, Plaintiffs submitted a claim under the Policy.**

10.     On June 15, 2016, Walker reported to USAA CIC that wind and related power surges caused damage to a shed near the home and some electronics and appliances therein. Ex. 3, (June 2016) USAA-0074. To settle the claim, USAA issued claim payments to Plaintiffs that totaled $5,047.61. *Id.* at USAA-0083, 85-86, 99. As part of his first claim, Walker submitted an inventory list for his unscheduled personal property ("UPP") claim. *Id.* at USAA-0030, 81.

**C.     Within four months of its issuance, Plaintiffs submitted a second claim under the Policy that USAA CIC investigated and paid within 23 days.**

11.     On September 25, 2016, Walker reported to USAA CIC that while Plaintiffs had been away with a sitter watching the home, a storm came and the home lost power so the sitter left, and when Plaintiffs returned, they "found water damage to [the] home." Ex. 4, Claim notes at USAA-00054-55.

12.     Walker reported "very dirty water [was] coming up through the dishwasher and sink in the kitchen," and the "carpet [was] ruined with stinky dirty water." *Id.* at USAA-00055.

13.     Walker stated that no water was coming up through the bathroom sink toilet, or shower. *Id.* at USAA-00055; Ex. 5, Walker Depo. Tr. at 353:15-22.

14.     On September 29, 2016, Walker gave USAA CIC a "thumbs up" when asked how USAA CIC was doing so far.  Ex. 4, USAA-00056.

15.     On September 29, 2016, Walker told USAA CIC that the plumber had identified the cause of loss as "sticks and bugs" in the "piping" that got in through a "vent [on the roof] that was blown off." Walker told USAA CIC that the plumber repaired the cause of loss by "replac[ing] the line completely." Walker agreed to submit to USAA CIC the plumber's bill. Walker stated that he had performed water mitigation himself and that Repair Solutions would perform the rebuild. Walker was told to submit a list and photographs of damaged UPP. *Id.* at USAA-00057.

16.     On September 30, 2016, Walker told USAA CIC that he "w[ould] upload photos and invoices" he had "so far." *Id.* at USAA-00057.

17.     On October 3, 2016, Walker sent USAA CIC an invoice from Dismuke Plumbing dated September 29, 2016 for repair of the alleged cause of loss. Ex. 4, USAA-00058; Ex. 6, invoice at USAA-00100. USAA adjuster Patricia Catalano responded that

the Policy did not cover the invoice for "the plumbing repair" but it did cover the "ensuing water damage." Ex. 4, USAA-00058.[1]

18.     On October 5, 2016, Walker told USAA CIC that he could not "use [the] kitchen for cooking, [or] washing dishes." In response, USAA CIC advised Walker on the documents and information he needed to submit to initiate a claim for additional living expenses/loss of use ("ALE"). Ex. 4, USAA-00058-59. Walker was sent an email after the call that provided the same information. Ex. 7, USAA-00103-05. Walker did not submit the requested materials at any time before litigation. Ex. 8, Portion of Plaintiffs' Supplemental Discovery Responses dated November 19, 2018.

19.     On October 12, 2016, Ben Phillips, an independent adjuster ("IA") with Americlaim, inspected and photographed the loss with Walker. Ex. 9, USAA-00133-00134 (loss report) and USAA-00162-171 (photographs with IA notations). Phillips prepared a loss report and a repair estimate. *Id.*; Ex. 10, USAA-00177-188 (repair estimate).  Phillips noted that "[a]t [the] time of [the] inspection, [Walker] had already removed the damaged flooring," his "inspection of the subfloor found no visible water damage," and the storage room had bare concrete flooring. Ex. 9, at 00133.

20.     The flooring in the property was removed before Phillips' inspection. Ex. 5, Walker Depo. Tr. at 156:20-158:6; Ex. 9, USAA-00133; Ex. 4, USAA-00061.

21.     After the inspection, Walker called USAA CIC and said that he had already made three trips to the landfill to dispose of debris, and was going to make two more.

---

[1] Plaintiffs produced a copy of the Dismuke Plumbing invoice that appears to show the date as September 27, 2016. The date of invoice and the two-day difference is immaterial to the legal issues raised in this motion.

USAA CIC responded that the repair estimate would include an "allowance for debris removal." Walker also asked about a UPP claim and USAA CIC advised that it would "send [an] email to him" to which he could respond with "photos, description, age and [replacement] info" about allegedly damaged UPP.  Walker was sent an email after the call. Ex. 4, USAA-00060, Ex. 11, USAA-00111-112.

22.     Walker then submitted a receipt dated October 11, 2016 that stated it was for "items purchased for floor cover removal," and stated he "w[ould] be uploading .PDF spread sheet of other personal items damaged shortly. Thank you very much for guiding me flawlessly [  ] through these issues." Ex. 4, USAA-00060; Ex. 12, USAA-00113. Catalano told Walker to "itemize the receipts and provide a summary of what they are." Ex. 4, USAA-00061.

23.     On October 13, 2016, Phillips told Catalano that he saw no damage "whatsoever" to the subflooring. Ex. 4, USAA-00061. Phillips told Catalano that based on the amount of drywall and flooring removed from Plaintiffs' home, he could "only see" enough for two trips. *Id.*

24.     Phillips also told Catalano that Walker appeared to be looking for home maintenance because Walker asked that the repair estimate for the claim-related damage include amounts to repair water damage to the living room flooring caused by a ruptured fish tank that was not part of the loss. Ex. 13, Phillips Depo. Tr. at 309:14-19; 311:22-24; 312:6-21; 313:15-20; Ex. 4, USAA-00061.

25.     Phillips and Catalano noted that this was Plaintiffs' second claim under the Policy. Ex. 4, USAA-00061.

26.     On October 14, 2016, Walker called USAA CIC and said that "he is working on [the] upp list and will submit [it] when complete." *Id.* at USAA-00062. Walker did not submit a spreadsheet of UPP he claimed at that time, or at any time before litigation. Ex. 5, Walker's Depo. Tr. at 241:17-242:13.

27.     On October 18, 2016, Catalano noted that Walker told her the "bedroom carpet was $1[,]200," and that she "would need [an] invoice to substantiate as the home does not appear to have high end amenities." Ex. 4, USAA-00063.

28.     Later that same day, USAA CIC issued payment to Plaintiffs in accordance with the repair estimate prepared by Phillips for $1,928.55, net their $2,000.00 deductible. *Id.* at USAA-00064.

29.     After the check was issued and before litigation, Plaintiffs did not complain about the amount of the payment for the items included within. *Id.* at USAA-00064-66.

**D.     After payment, Walker submitted additional claimed damages as claim-related and SIU denied the additional claimed damages.**

30.     On October 19, 2016, Walker submitted additional items he claimed sustained claim-related damage but were not in Phillips' repair estimate, specifically, the kitchen countertops and storage room flooring. *Id.* at USAA-00066.

31.     Walker stated Phillips asked him about the flooring in the storage room because "it was removed [during the inspection]," and that he told Phillips that "the flooring in the storage room area with homemade step" was "the same flooring in the kitchen area," but Phillips "may not have heard him." *Id.* at USAA-00066.

32.     Walker also stated that the kitchen countertops are damaged, and referenced photos of the countertops that showed they were "already separating…where water was running and are peeling almost all the way back." *Id.*

33.     Walker sent a photograph of the storage room.  *Id.*; Ex. 14, USAA-00213.

34.     That same day, Catalano spoke with Phillips who stated "[h]e believes the loss is adjusted correctly." Ex. 4, USAA-00065.

35.     Phillips explained that the flooring samples Walker gave him were "pristine and new" and "not representative of what [Plaintiffs'] had." Phillips also reported that "[Walker] called [Phillips'] manager and said he had a flooring estimate for $3,700." Phillips stated that "[t]here was no water staining on the plywood subfloor what-so-ever." *Id.* at USAA-00065.

36.     On October 19, 2016, and October 20, 2016, respectively, Catalano referred Plaintiffs' claim to the SIU for further investigation, and SIU accepted the referral. *Id.* at USAA-00065-67.

37.     On October 20, 2016, Catalano noted that "[Walker] uploaded [a] picture of [the] storage room," that depicted "UPP everywhere and no indication there was flooring." She noted "the [cause of loss] was the drain line under the sink," so it was "unk[own] how [the kitchen] counters could now be delaminating," and "[p]hotos show [the kitchen] counters in poor condition unrelated to the loss." *Id.* at USAA-00066-67.

38.     That same day, Catalano spoke with Phillips. Phillips "disagree[d] with [Walker] that [Walker] said he had flooring in the storage room." Phillips stated "[t]here was no flooring in that room, [Phillips and Walker] had a discussion about that and

11

[Walker] confirmed [it] was a bare concrete." Phillips also stated that the countertops were "very old," "already swelled," showed "long term exposure, nothing to do with overflow," "[v]ery poor condition, and warped," and "NOT claim related damage." Phillips also "adv[ised] that the pluming bill reflects drain line damage but not an overflow." *Id.* at USAA-00067.

39.     Brenda Reavis-Alves, an investigator with Veracity Research Company assisted with SIU's investigation of Plaintiffs' claim. *Id.* at USAA-00067-69.

40.     Reavis-Alves spoke twice with Roy Dismuke, one of the plumbers from Dismuke Plumbing that visited the home on September 29, 2016. During the calls, Dismuke "advised the flooring was already wet and damaged when he arrived [at] the [home]." He "said he did not believe there was an insurance claim based on what he observed." He stated that "Walker initially reported water was coming through the sewer line due to a storm that occurred while he was out of town." Dismuke explained that "if water was coming into the house from a sewer line, it would not rise 34" to come up through the kitchen sink, but rather it would come from the lowest water outlet in the house such as the tub or shower." Dismuke explained the "sink was stopped up," and the "sink was not set up to drain properly" and "was not plumbed properly in the first place." Dismuke "recall[ed] Walker telling him since he had insurance he planned to get the place fixed up." *Id.* at USAA-00075, 78.

41.     Walker told Reavis-Alves that "he had to remove the sub flooring from his daughter's room as it had become soft and damaged due to the water backup." *Id.* at USAA-00083.

12

42.     Reavis-Alves spoke with Terry Reese, the individual that was house sitting and feeding Plaintiffs' animals while they were out of town at the time of the loss. Reese stated "he did not see or hear water coming into the home," and "did not smell anything unusual at the [home]." *Id.* at USAA-00073.

43.     On December 27, 2016, USAA CIC issued a letter partially denying the claim for payment of additional claimed damages. Ex. 15, USAA-000240-241.

**E.    Plaintiffs filed this lawsuit and asserted a new cause of loss, and discovery revealed additional relevant information.**

44.     In the Complaint for this lawsuit, Plaintiffs alleged the home was damaged on September 25, 2016, by "a blackwater sewage overflow and discharge inside their home." Doc. 1 at ¶ 12.

45.     As of May 16, 2016, on the quitclaim deed for Plaintiffs' home, Ronnie Newsom was listed as the grantee. Ex. 16, USAA CIC-00816-817.

46.     Repair Solutions, the company Walker told USAA CIC would do the rebuild, is the fictitious name of Walker's sole proprietorship. Ex. 17, Certificate of Fictitious Name; Ex. 18, Walker's Answer to Interrog. No. 15; Ex. 4, USAA-00057.

47.     Waste Connections, the company that operates the City of Duncan landfill has no record of Plaintiffs signing in to use the landfill between September 26, 2016 and October 31, 2016. Ex. 19, CITY OF DUNCAN 0008-0064.

48.     Plaintiffs told Reavis-Alves that the flooring in the home at the time of the loss was purchased at Allison's Flooring. Allison's Flooring has records that show Plaintiffs purchased carpet and flooring on June 28, 2013, but returned the flooring and

13

received a refund on July 29, 2013. Ex. 4, USAA-000078-79; Ex. 20, ALLISON'S FLOORING 0001-0002.

49.   Walker testified that at the time of the loss, the storage room's flooring was bare concrete. Ex. 5, Walker Depo. Tr. at 143:11-19.

50.   Walker testified that Plaintiffs began removing all the home's damaged flooring the night they discovered the loss, September 25, 2016, and finished in the early morning hours of September 26, 2016. *Id.* at 156:20-158:6.

51.   Walker testified that the smell and the "feel [of] liquid underneath" his feet were the first things he noticed when Plaintiffs returned home on September 25, 2016 and discovered the loss. *Id.* at 145:7-23.

52.   Walker testified that the cause of loss he reported to USAA CIC on September 29, 2016 as "sticks and bugs" in the home's "piping" due to an "open vent on [the] roof" and that he said was identified and repaired by a plumber with Dismuke Plumbing by "replac[ing] the line completely" actually happened "prior" to "the water incident that is the subject of this claim [submitted on September 25, 2016]." *Id.* at 357:8-359:19.

53.   Newsom testified during her deposition that she had not "ever noticed overflow from . . . the base, like around where the bathtub is caulked or from down in the drain of the tub." Ex. 21, Newsom Depo. Tr. at 78:5-17.

54.   Plaintiffs presented new estimates for the first time from Dason Fire & Water Restoration, dated March 2, 2017, and presented to USAA CIC as part of Plaintiffs' litigation discovery. Ex. 22, Plfs' RFP Docs.0363-0387.

55.     USAA CIC's expert Mike Berryman, during his inspection of the home,

made the following observations about the kitchen countertops:

> Kitchen countertops were approximately 35" above the floor and in a state
> of disrepair. Pieces of the countertop edge were broken and missing. The
> countertop was not sealed properly to the backsplash. The underside of the
> countertop showed evidence of long term exposure to wetting.
> ...
> Kitchen countertops. As previously outlined in this report, the countertops
> would not have been impacted by a plumbing back-up at the sink. At any
> rate, kitchen countertops are made to get wet. Water from a sink, either
> fresh water or back-up water from a single event would not damage the
> countertops. I observed the countertops were in a state of disrepair from
> wear, tear and poor maintenance unrelated to Walker's claim.

Ex. 23, Berryman's Expert Report at pp. 10, 29.

56.     Berryman also explained that there was no evidence to support a conclusion

that the City of Duncan's sewer line backed up into Plaintiffs' home such that sewage

came into the home, including the following evidence:

> Records obtained from the City of Duncan indicate there were no calls from
> Walker or any other municipal resident voicing a complaint concerning
> surges or back-ups in the city's main sewage lines at or about the reported
> date of loss. At any rate, such a surge would have caused sewage to appear
> in the bathtub first, and this did not occur.
> …
> A Category 3 sewage would back-up first in the bathtub before it would
> back up and overflow the toilet. This did not occur. The basis for this
> conclusion includes:
>
> - Due to the design of plumbing drainage lines and hydraulics, a back-
>   up would occur in the lowest drain in the house first.
> - Robert Walker testified that water was not coming up through the
>   bathroom sink, toilet or shower when he and his wife returned from
>   their trip.
> - Brandy Newsom also testified that she had not seen an overflow
>   from the bathtub.

Id. at pp. 18, 22 (internal footnotes omitted).

15

57.     Plaintiff's expert Kevin Hefley admits the only evidence that the cause of loss may be a sewage backup is that Plaintiffs said so.    Ex. 24, Hefley's Depo. Tr. at 136:2-19; 137:14-23; 194:12-195:1; 196:5-197:2; 214:21-215:18.

58.     Plaintiff's expert Frank Fine admits the only reason he believes the cause of loss may be a sewage backup is because Plaintiffs told him there was sewage backup. Ex. 25, Fine's Depo. Tr. at 46:3-9.

### III.    ARGUMENT AND AUTHORITIES

**A.    USAA CIC is entitled to summary judgment on Plaintiffs' breach of contract claim.**

Summary judgment is proper on Plaintiffs' allegation that USAA CIC breached the Policy by underpaying the loss.  First, USAA CIC paid all claim-related and covered damages presented at the time of claim before litigation.   Second, Plaintiffs lack admissible evidence to support submission of additional claim-related damages presented in litigation discovery to the jury.  Finally, even if the Court were to consider evidence brought forth now, the Court should reject Plaintiffs' attempt because discovery also revealed that Plaintiffs misrepresented facts to procure the Policy.

**1.    USAA CIC paid the claim-related loss insured by the Policy as presented during the claim before litigation.**

Insurance policies are contracts and subject to the rules for contract interpretation. *Am. Economy Ins. Co. v. Rutledge*, 833 F. Supp. 2d 1320, 1322 (W.D. Okla. 2011). The terms of an insurance policy "are accepted in their plain and ordinary sense," and enforced to carry out the parties' intentions if "unambiguous, clear, and consistent." *Dodson v. St. Paul Ins. Co.*, 1991 OK 24, 812 P.2d 372, 376 (internal citations and

footnote omitted). When policy language is unambiguous, the policy should be enforced as written to give effect to the parties' intent. *Rutledge*, 833 F. Supp. 2d at 1322.

Under the Policy, USAA CIC "insure[s] against 'sudden and accidental', direct, physical loss to" the property resulting from "[d]ischarge or overflow of water . . . from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance." UMF 7. "This peril does not include loss . . . [t]o the system or appliance from which the water escaped . . . ." *Id.* "'Sudden and accidental' means an abrupt, fortuitous event which is unintended from the perspective of a reasonable person." UMF 7. Plaintiffs must present a claim for the loss. USAA CIC then pays the lesser of the actual cash value, USAA CIC's cost to replace the property with property of like kind, quality, age and condition, or USAA CIC's cost to repair or restore the property to the condition it was in just before the loss. UMF 8.[2]

USAA CIC paid for all claim-related damages insured by the Policy and that were presented by Plaintiffs during the claim and before litigation. UMF 19, 28.

On September 25, 2016, Walker notified USAA CIC that the home was damaged by water coming up through dishwasher and kitchen sink. UMF 11-12. Four days later, Walker told USAA CIC that the plumber had identified and repaired the cause of loss. UMF 15. Walker agreed to submit to USAA CIC the plumber's bill. UMF 15. Walker also stated that he had performed water mitigation himself and that All Repair Solutions would perform the rebuild. UMF 15. On October 3, 2016, USAA CIC told Walker,

---

[2] The Policy provides an additional coverage—with exceptions—for off premises sewer loss with a limit of $10,000. Ex. 2, USAA-00051.

based on the cause of the water backup set forth in the plumber's repair invoice Walker submitted, the Policy covered the "ensuing water damage." UMF 17. IA Phillips then scoped the loss with Walker and prepared an estimate.  UMF 19.

On October 18, 2016, within 30 days of the first notice of loss, and based upon the IA's loss report and estimate, USAA CIC issued a payment to Plaintiffs for $1,928.55, which was $3,928.55 in loss to the property, less the Policy's deductible. UMF 28. USAA CIC told Walker that Plaintiffs should submit receipts and pricing list for any UPP damages he was claiming.  UMF 15, 21-22. Walker acknowledged this but failed to submit any proof of loss for UPP at the time.  UMF 16, 22, 26.  At the time of payment, Plaintiffs did not complain about the amount of the payment for the items included within the IA's estimate.  UMF 29.

USAA CIC issued the payment to Plaintiffs despite the IA reporting he found no visible water damage to the exposed subflooring, UMF 19, 23, and despite the IA noting it appeared that Walker was using the Policy to pay for routine, not covered, "home maintenance." UMF 24.  This claim was also Plaintiffs' second claim under the Policy within a few months of the inception. UMF 6, 10, 25. USAA CIC, however, gave Plaintiffs the benefit of the doubt and paid to repair and replace portions of the property that could have been damaged by water backing up through the dishwasher and kitchen sink, as reported by Walker.

**2.      Plaintiffs have no admissible evidence that any additional claimed damages are covered by the Policy or owed by USAA CIC.**

Plaintiff cannot prove that any additional damages they claim—either at the time of the claim or now as presented in litigation—are owed under the Policy. Plaintiffs' complaints during the claim about kitchen countertops and storage room flooring do not create a triable issue of fact. UMF 30-32. The Policy provides for "sudden and accidental, direct physical loss" to the property from the discharge or overflow of water from a plumbing system or from within a household appliance. UMF 7. This language is unambiguous and should be enforced as written.

Any damage to the countertops is not sudden and accidental. Their appearance— swelled, warped, and delaminating—evidenced long term exposure that was not related to the loss. UMF 37-38; Ex. 9. Additionally, USAA CIC's expert Mike Berryman explained that kitchen countertops are made to get wet, a single water event would not damage the countertops, and the kitchen countertops were not impacted by the loss as described by Plaintiffs. UMF 55. The countertops were not "sealed properly to the backsplash," and showed signs of "long term exposure to wetting," and "disrepair from wear, tear, and poor maintenance unrelated to the [Plaintiffs'] claim." UMF 55. In sum, the damage to the kitchen countertops is not from a sudden and accidental discharge or overflow of water from a plumbing system or from within a household appliance.

The storage room flooring does not create a triable fact issue by Walker's own admissions. During the claim, he sought payment from USAA CIC for the storage room flooring. UMF 30-31. Walker told USAA CIC it owed for laminate flooring in the storage room. UMF 30-31. In response, USAA CIC reminded Walker that he had told the

IA during the inspection that there was no flooring in the storage room, just bare concrete. UMF 31. Walker responded that the IA had misunderstood. UMF 31.

Under the Policy, however, USAA CIC would only repair or replace the property to the condition it was before the loss. UMF 7. Walker now admits there was no laminate flooring in the storage room at the time of the loss, just bare concrete. UMF 49. Thus, while Walker originally sought the flooring, no coverage is owed.

Plaintiffs now contend in litigation that the cause of loss was blackwater sewage backup but they have no admissible evidence of it. UMF 44. Plaintiffs' "[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings." *Phillips v. Calhoun,* 956 F.2d 949, 950 n.3 (10th Cir. 1992). Further, their allegations are directly contradicted by Walker's statements and conduct during claims handling. Walker told USAA CIC that he would and did handle water mitigation and repair the alleged damage on his own. UMF 15, 46.

In an attempt to overcome this shortfall, Plaintiffs submit estimates, produced for the first time during this litigation, by Kevin Hefley and Frank Fine as their only economic showing of damages for breach. UMF 54. But these estimates constitute incompetent evidence. Neither says the cause of loss is sewage overflow. Rather, they take no position. Ex. 22. To the extent they do take a position, they only parrot what Plaintiffs told them, resulting in the exclusion of those opinions. UMF 57-58; Docs. 67-68.

The only competent evidence reveals that the cause of loss cannot be a sewage backup. If sewage from a city sewer line backed up into the home's plumbing system, it

would first come out the lowest drains in the home, which is the bathtub. UMF 40, 56. However, when Walker submitted the claim, he stated that nothing was coming up through the bathtub. UMF 13. Both Plaintiffs further admitted this fact during their depositions. UMF 13, 53. Moreover, city records reflected no calls from Walker or any other city resident on his block regarding a complaint about the municipal sewer line servicing their block. UMF 56.

Accordingly, USAA CIC cannot have breached the Policy for failing to pay for damage that the undisputed facts show is not insured by the Policy or for a loss, a sewage backup, that did not occur.[3]

### 3.     Recasting the claim in suit should not get Plaintiffs before a jury as Walker made material misrepresentations to procure the Policy.

Alternatively, even if the Court determines that there is a triable fact issue based on Plaintiffs' litigation claims or theories presented for the first time to USAA CIC in the lawsuit, Plaintiffs' claim still fails because Walker procured the Policy through misrepresentations about Plaintiffs' interest and ownership in the property.

The Policy's "Concealment, Misrepresentation or Fraud" provision bars coverage where either Plaintiff mispresented any material fact relating to the issuance of the Policy or in the presentation of a claim that if known by USAA CIC would have caused USAA

---

[3] During claims handling, USAA CIC told Walker three times the documentation he needed to submit for a UPP claim and twice the documentation he needed to submit for an ALE claim, Walker acknowledged that he understood.  UMF 15-16, 18, 21-22, 26. However, Plaintiffs did not submit the requested documentation during claims handling. UMF 18, 26.  Instead, they submitted a claim recently through counsel and long after filing this lawsuit.   USAA CIC is reviewing the documentation and adjusting the claim. It has not yet reached a claim decision.

CIC to not issue the Policy. UMF 9. The burden of providing accurate answers in an insurance application and the risk of false answers being provided falls on the insured. *Hobbs v. Prudential Property & Cas. Co.*, 1993 OK CIV APP 76, 853 P.2d 252, 255.

Plaintiffs' claims are barred because they misrepresented a material fact in their application for the Policy. While applying for the Policy on May 14, 2016, Walker was asked whether Plaintiffs' names appear on the deed for the home UMF 1, 3. Walker answered yes. UMF 3. However, on that date, Plaintiffs' names were not on the deed. UMF 45.

Walker's misrepresentation that Plaintiffs had record title to the home in May 2016 is material.  Whether an insured has proof of legal title to the property the insured seeks to insure under a homeowners' policy for a primary residence is a significant factor in whether USAA CIC chooses to accept the risk and issue the policy. UMF 2, 5-6; Ex. 1. Per USAA's underwriting guidelines, USAA CIC only issues homeowners' policies to insureds that are owners of the property and have proof of legal title. UMF 2, 6; Ex. 1. Asking whether an insured has record title is the quickest and easiest way to confirm that a member has proof of legal title. UMF 2; Ex. 1. Thus, Walker stating Plaintiffs had record title was material to USAA CIC's acceptance of the risk to insure the property and issue the Policy.  UMF 4-5; Ex. 1. *Long v. Ins. Co. of N. Am.*, 670 F.2d 930, 934 (10th Cir. 1982) (misrepresentation is material "if a reasonable insurance company, in determining its course of action, would attach importance to the fact misrepresented") (internal citations omitted).

That USAA CIC could have discovered the misrepresentation by independently researching Walker's representation does not render it immaterial. USAA CIC could rely on Walker's representations without confirming their veracity, as is its practice (Ex. 1), as a matter of law. *Hobbs*, 1993 OK CIV APP 76, 853 P.2d at 255 (insurer could rely upon insureds' representations about its loss history and had no obligation to verify the information given by the insureds, even though insurer could have confirmed the information for $25 through the Property Insurance Loss Register).

Because the undisputed facts establish that but for Plaintiffs' material misrepresentation that their names were on the deed for the home when they applied for the Policy, USAA CIC would not have issued the Policy, Plaintiffs have breached the Policy. Consequently, Plaintiffs are precluded from receiving additional benefits under the Policy that they procured in violation of the Policy.

**B.  USAA CIC is entitled to summary judgment on Plaintiffs' bad faith claim.**

Plaintiffs' bad faith claim fails as a matter of law because they cannot show with competent evidence that they are entitled to additional coverage or payments under the Policy.  Plaintiffs' bad faith claim also fails based on legitimate dispute.

**1.  Plaintiffs cannot satisfy their burden of creating a triable fact issue on coverage or payment.**

Plaintiff cannot prove that they were entitled to coverage or additional payment under the Policy, essential components of a bad faith claim.  *Emmanuel Baptist Church v. State Farm Fire & Cas. Co.*, No. CIV-11-594-D, 2012 WL 3595093, at *7 (W.D. Okla. Aug. 21, 2012) (citing Oklahoma Uniform Jury Instructions-Civil (2d), No. 22.2;

*Christian v. Am. Home Assur. Co.*, 1977 OK 141, 577 P.2d 899, 905 (must be a clear showing of payment owed).  The absence of these elements defeats the bad faith claim. *Ball v. Wilshire Ins. Co.*, 2009 OK 38, 221 P.3d 717, 724.

No competent evidence exists by Plaintiffs to prove there is coverage or payments owed under the Policy for the additional claimed damages and Plaintiffs' newly asserted and unproven cause of loss. UMF 57-58; Doc. 67-68. When there has been no breach of an insurance policy, "it follows a company's denial of coverage was not unreasonable." *Coonce v. CSAA Fire & Cas. Ins. Co.*, 748 F. App'x 782, 785 (10th Cir. 2018) (internal citation omitted) (unpublished). Accordingly, USAA CIC also is entitled to summary judgment on Plaintiffs' bad faith claim. *Cf. Emmanuel*, 2012 WL 3595093, at *1 (explaining the movant "need only point to 'a lack of evidence for the nonmovant on an essential element of the nonmovant's claim'" and that it is not necessary for the insurer to disprove the plaintiff's claim) (internal quotation marks and citation omitted).

### 2.     Plaintiffs' bad faith claim reveals a legitimate dispute.

"The existence of a legitimate dispute negates an inference of bad faith as a matter of law."  *Harris v. Progressive Direct Ins. Co.*, 740 F. App'x 900, 910 (10th Cir. 2018) (internal quotation marks and citations omitted) (unpublished); *see Christian*, 577 P.2d at 904-05 (no bad faith where there are disagreements on such matters as "insurable interest, extent of coverage, cause of loss, amount of loss, or breach of policy conditions"). In determining whether there were facts sufficient to justify an insurer's denial, courts have held that the insurer can reasonably rely upon information provided by third parties, and can even rely upon such information over that provided by its insureds when there is

information challenging the insured's explanation of the loss.  *Newman v. State Farm Fire & Cas. Co.*, 290 F. App'x. 106, 117 (10th Cir. 2008) (unpublished).

USAA CIC had significant information indicating a legitimate dispute over amount of loss, scope, damages, and cause of loss.  The IA's photos of the kitchen countertops taken during his October 12, 2016 inspection of the home with Walker showed the countertops did not suffer damages from a single, sudden and accidental water overflow event. UMF 19, 37-38. The IA also pointed out the plumber's invoice submitted by Walker as proof of the cause of loss reflected drain line damage, but nothing to support a water overflow capable of damaging the kitchen countertops. UMF 38. During the inspection, Walker told the IA that there was no flooring in the storage room, and a photo of the storage room that Walker sent to USAA CIC showed the storage room floor littered with items but no indication of flooring. UMF 33, 38.  The IA also reported Walker gave flooring samples that were not representative of the flooring in the home at the time of the loss. UMF 35.

On September 29, 2016, Walker reported Dismuke Plumbing identified and repaired the cause of loss, a clogged kitchen drain, and on October 3, 2016, submitted an invoice dated September 29, 2016 as proof. UMF 15, 17.  However, in litigation, for the first time, Walker claimed that the invoice was not from this claim but was from a different, non-claim related occasion Dismuke Plumbing visited the home and fixed a plumbing issue. UMF 52.[4]

---

[4]  Dismuke is deceased; USAA CIC thus cannot test that testimony by Walker.

The plumber told the investigator that the cause of loss was a clogged kitchen sink because it was not set-up to properly drain, not water coming in the home through the city sewer line as reported to him by Walker.  UMF 39-40. The plumber explained that if water was coming into the home through a sewer line, it would not rise 34" to first come up through the kitchen sink, but rather would first come out the lowest water outlet in the house such as the tub or shower. UMF 39-40. The plumber also "recalled Walker telling him since he had insurance he planned to get the place fixed up." UMF 39-40.

Like the plumber, the IA noted Walker appeared to be using the Policy to pay for routine, home maintenance, not the purpose of a property coverage that insures "sudden and accidental" losses. During the inspection, Walker indicated he was looking for "home maintenance" because he asked the IA to include amounts to repair damage that was not claim related (water damage from the large fish tank). UMF 24.

When Plaintiffs returned home and discovered the loss, the first thing Walker noticed was the smell, and that he could feel the water in the floor when he walked. UMF 51. However, Terry Reese, who had been house-sitting and feeding Plaintiffs' animals at the time of the loss, stated he did not smell anything unusual at Plaintiffs' home, and he did not see or hear water coming into the home. UMF 39, 42.

As to the condition of the flooring after the loss, Walker also testified that Plaintiffs removed all of the wet, damaged flooring the night they discovered the loss on September 25, 2016 and into the early morning hours of September 26, 2016. UMF 50. The plumber told the investigator that when he visited the home after the loss on September 29, 2016, the flooring was wet and damaged. UMF 39-40. During his

inspection of the home with Walker on October 12, 2016, the IA found no visible water damage to the subflooring. UMF 19. Walker told the investigator that the subflooring in his daughter's bedroom was damaged by the water backup. UMF 39, 41.

As to costs incurred removing the damaged flooring, Walker asked to be reimbursed for hauling five loads of claim-related debris to the city landfill because he had already taken three loads between September 25, 2016 and October 12, 2016 and expected to make two more. UMF 21. However, the IA explained the home was not large enough to produce more than two loads of debris. UMF 23. Moreover, the City of Duncan has no record of Plaintiffs using the landfill between September 25, 2016 and October 31, 2016. UMF 47. Walker testified that Plaintiffs removed all of the wet, damaged flooring very quickly. UMF 50. Despite this, Walker submitted a receipt dated October 11, 2016 that he represented was for "items purchased for floor cover removal." UMF 22.

As to the cost to replace the damaged flooring, despite the small size of the home (roughly 900 square feet) and the poor condition of other features in the home, Walker tried to obtain $1,200 to replace the carpet, and then $3,700 to replace the allegedly damaged flooring in the home. UMF 27, 35. Plaintiffs told the investigator it was purchased at Allison's Flooring. UMF 48. While Allison's Flooring has records that show Plaintiffs purchased carpet and laminate flooring in 2013, the records show Plaintiffs later returned the flooring for cash. UMF 48.

To try to deflect from these multiple legitimate disputes precluding bad faith, USAA CIC anticipates that Plaintiffs will point to mistakes in USAA CIC's partial denial

letter. The Court, however, has recognized that errors in the processing of the claim, "confusion or mistaken statements," and even an admission that "mistakes were made" is not probative of bad faith because bad faith and negligence are not synonymous. *Errahmouni v. Progressive N. Ins. Co.*, No. CIV-12-1380-HE, 2013 WL 6410985, at *4 (W.D. Okla. Dec. 9, 2013). The Tenth Circuit recently has indicated it is in accord with this view. *See Harris v. Progressive Direct Insurance Co.*, 740 F. App'x 900, 912-13 (10th Cir. 2018) (an adjuster's negligent omission of a fact when explaining the claims process to an insured "is not good enough to establish liability under the bad faith tort") (applying Oklahoma law). Any errors or mistakes in the partial denial letter do not negate the undisputed material facts showing no coverage or a legitimate dispute warranting summary judgment.

## C.     No evidence warrants submission of punitive damages to the jury.

Plaintiffs assert they are entitled to punitive damages because the "bad faith conduct of [USAA CIC] in the handling of Plaintiffs' claim was committed with a reckless disregard for the right of the Plaintiffs . . . ." Doc. 1, Compl. ¶ 31 (only alleging Category 1 damages). Their assertion has no support.

Plaintiffs cannot recover punitive damages simply because they allege a bad faith claim. *See Estrada v. Port City Props., Inc.* 2011 OK 30, ¶ 16, 258 P.3d 495, 502, n.21 (explaining punitive damages only arise in tort). As discussed above, their bad faith claim cannot survive summary judgment. Regardless, there is no evidence of punitive-damages-worthy conduct—which is more than ordinary tortious conduct—in this case. *Id.* ("Punitive damages are awarded only in the most egregious circumstances and are aimed

at punishing the offending party.") (citing *Wilspec Techs., Inc. v. DunAn Holding Gr. Co., Ltd.*, 2009 OK 12, ¶ 18, 204 P.3d 69).

"[P]unitive damages do not ipso facto follow from *every* breach of [the duty of good faith and fair dealing] or in *every* case a jury may render a verdict for the wronged party." *McLaughlin v. Nat'l Ben. Life Ins. Co.*, 772 P.2d 383, 385, 1998 OK 41 (internal citation omitted) (emphasis in original). "Even where there is evidence to support the recovery of actual damages in a bad faith action against an insurer, submission of the issue of punitive damages to a jury may be improper." *Willis v. Midland Risk Ins. Co.,* 42 F.3d 607, 614–615 (10th Cir. 1994) (citing *McLaughlin*, 772 P.2d at 383, 385, and 389). This is because, as stated by the Oklahoma Supreme Court, "[e]xemplary damages are highly penal and punishment thereof should not be lightly imposed." *Id.* (internal citation and quotation marks omitted).

Plaintiffs cannot assert Category 1 damages because there is no evidence of reckless disregard, much less clear and convincing evidence of reckless disregard. Okla. Stat. tit. 23, § 9.1(B).  Additionally, this is not a case to submit to the jury for punitive damages because of Plaintiffs' ever-changing story.  Since the time of the claim to the time of litigation, Plaintiffs have changed their story about the facts of this loss.  For example, at the time of the claim, Walker tried to gain coverage for his storage room flooring.  UMF 30-31.  He now concedes that room did not have any laminate flooring. UMF 49. At the time of the claim, Walker relayed to USAA CIC the plumber's findings concerning a clogged roof vent as if that explained the cause of loss. UMF 15. He now says that concerned a different plumbing event, prior to this loss.  UMF 52.  Based on

what USAA CIC had in front of it at the time of the claim, USAA CIC was not unreasonable in its decision to partially deny the claim for additional damages after its initial payment. *Cf Agrawal v. Farmers Ins. Co.*, No. 11-CV-087-GKF-TLW, 2012 WL 124547, at *4 (N.D. Okla. Jan. 17, 2012) (ruling that insurer was entitled to summary judgment on the punitive damages claim).

Because Plaintiffs' evidence fails to support submitting the question of punitive damages to the jury, USAA CIC respectfully requests summary judgment on Plaintiffs' claim for punitive damages, or alternatively, a ruling by the Court that the question of punitive damages should not go to the jury in this case.

## CONCLUSION

Plaintiffs' breach of contract and bad faith claims against USAA CIC fail and should not be presented to a jury. When only competent evidence is considered and Plaintiffs' experts are properly excluded, USAA CIC respectfully submits that this Court should enter judgment in its favor on Plaintiffs' claims.

Respectfully submitted,

*s/ Jodi W. Dishman*

Jodi W. Dishman, OBA # 20677
McAfee & Taft A Professional Corporation
211 North Robinson, 10th Floor
Oklahoma City, OK  73102
Telephone:   (405) 235-9621
Facsimile:   (405) 235-0439
E-mail:        jodi.dishman@mcafeetaft.com

-and-

William S. Leach, OBA # 14892
Anna Imose, OBA # 32021
McAfee & Taft, A Professional Corporation
Williams Tower II
Two West 2nd Street, Suite 1100
Tulsa OK  74103
Telephone: (918) 587-0000
Facsimile:  (918) 599-9317
Email:   bill.leach@mcafeetaft.com
            anna.imose@mcafeetaft.com

ATTORNEYS FOR DEFENDANT USAA
CASUALTY INSURANCE COMPANY

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2019, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following registrants:

Maurice G. Woods, II OBA # 16582
McAtee & Woods, P.C.
410 N.W. 13th Street
Oklahoma City, OK 73103
ATTORNEYS FOR PLAINTIFFS ROBERT
WALKER AND BRANDY NEWSOM

*s/ Jodi W. Dishman*

Jodi W. Dishman