

# Berryman

426 N.W. 5TH
Oklahoma City, OK  73102
Off: (405) 235-4646
Fax: (405) 235-3311
Email:  mberryman@berrymanokc.com

November 20, 2018

Bill Leach
Jodi Dishman
McAfee and Taft
Two Leadership Square
211 North Robinson, Tenth Floor
Oklahoma City, Oklahoma  73120

**Re:     Robert Walker and Brandy Newsom,**
**Plaintiffs**
**v.**
**USAA Casualty Insurance Company,**
**Defendant**
**United States District Court**
**Western District of Oklahoma**
**Case #:  CIV-17-752-D**

Dear Mr. Leach and Ms. Dishman:

The following report details to date my pertinent observations, opinions and conclusions related thereto and can be changed only in writing by the undersigned.  My opinions are based upon my review of the documentation provided to me.  In forming my opinions I utilized my forty (40) years of experience as a construction general contractor as well as my formal education, training and knowledge previously acquired.  I reserve the right to supplement this report to address additional information made available to me and to provide illustrative exhibits at a later date.

## QUALIFICATIONS

I have been a general contractor since 1978 and have performed numerous property restoration projects for owners whose building structures have sustained damages caused by water or sewage intrusion and/or discharge. I have routinely examined structures for the extent and cause of sustained

**EXHIBIT 23**

Case 5:17-cv-00752-D   Document 69-23   Filed 02/20/19   Page 2 of 43
Walker and Newsom v. USAA                                    November 20, 2018
USDC #17-CV-00752-D                                          Page 2

damages and submitted construction proposals to the public for a property's restoration. In the regular course of business I have used the Xactimate estimating software program to formulate the construction costs and outline the scopes of work that have been an integral part of my firm's offers to contract for needed property restoration.[1] I have interfaced with insurance professionals in the course of business and developed a keen understanding of the customary means, methods and pricing for the restoration of damaged real property.

On more than 1,000 occasions, my firm has been hired as a consultant by property owners, property management companies, insurance carriers and others to inspect and render opinions on construction issues, including the nature and extent of property damages as well as the anticipated cost of their repair. I have been qualified as an expert witness in building and construction in the United States District Courts of the Western, Eastern and Northern Districts of Oklahoma, as well as in the District Courts of many counties in the State of Oklahoma.

## DOCUMENTS RELIED UPON

- Notice of Service of Process
- Summons
- Complaint
- Documents labeled USAA 213, USAA 230-381, USAA 382 (mp3), USAA 383, USAA 53-188
- Photos(June 2016) stamped USAA-0004-USAA-0016
- Plaintiffs' Discovery Responses and Production
- Rough draft of the deposition of Brandy Newsom taken 4/10/18
- Ben Phillips photos #5327-5345
- Deposition of Robert Walker taken on 4/09/18
- Deposition of Brandy Newson taken on 4/10/18
- Deposition of Patricia Catalano taken 4/17/18
- Deposition of Ben Phillips taken 4/13/18
- Letter to Plaintiff's attorney
- City of Duncan documents 0001-0007
- Dump sign in sheets 0008-0064
- Kevin Hefley report
- IICRC S500, Standard and Reference Guide for Professional Water Damage Restoration

---

[1]Xactimate is considered to be an industry standard and is utilized by most restoration contractors and the majority of insurance carriers in the United States and Canada to estimate the anticipated cost to restore property damages.

**EXHIBIT 23**

- Xactimate estimating system
- Video recordings of drain line inspections
- https://cedar-grove.com/docs/7.5x11_Truck_Capacities.pdf

## ISSUE

The Plaintiffs in this matter claim USAA's estimate to restore the storm damages to their home is insufficient to correct damages that occurred from a plumbing back-up. I reviewed the documents outlined above in order to form opinion(s) concerning the Plaintiffs' claims, including:

1. The nature and extent of the alleged damages, as well as the necessary scope of work to restore it.

2. The validity of the Plaintiffs' claim that their home was damaged by a "black water" sewage discharge.

3. The estimating methods used by USAA and the reliability and adequacy of its damage estimate.

4. The report and estimate provided by the Plaintiffs' expert in this matter.

5. The common standards and customary practices employed in the property damage restoration industry.

## PROPERTY DESCRIPTION

The subject property is a one level, single family residential structure owned by the Walkers. Based upon information and belief, the home was built in approximately 1930 and has 908 SF, more or less. It appears to be wood framed construction situated over an earthen crawlspace, the exceptions being the main living area and rear utility room which are supported by a cast-in-place concrete foundation and slab-on-grade. The exterior cladding of the home consists of painted wood siding. The roof structure is constructed with dimensional lumber and covered with asphalt composition shingles overlaid by metal roofing sheets. Generally, the home faces west.

**EXHIBIT 23**



## <u>BACKGROUND</u>

On September 25, 2016 Robert Walker (Walker) reported a plumbing backup event that he believed had occurred during a short time period that he and his family were out of town during the 3-4 days prior.  The event occurred at the property located at 12 North E Street, Duncan, Oklahoma.  Walker and his wife, Brandy Newsom (Newsom), filed an insurance claim with USAA Casualty Insurance Company (USAA) under their insurance policy #005532176/90A and USAA assigned the incident claim # 0055321176-003.  Ben Phillips (Phillips), an independent insurance adjuster for USAA, inspected the home on October 12, 2016 and issued a $3,928.55 dwelling damage estimate.   Adjuster Phillips utilized the Xactimate estimating software to create his estimate.

During Walker's initial 9/25/16 contact with USAA he related:[2]

- They were away at the time of the loss event.

---

[2] Walker v USAA Cas. Ins. Co. USAA-00054

**EXHIBIT 23**

- They had a house sitter while they were absent.  The house sitter left the property due to a loss of power.
- When he and his wife returned from their trip they observed very dirty water was coming up through the dishwasher and kitchen sink.
- He would take photographs and submit them to USAA.[3]
- Water was still "coming up" at the time that he reported the loss event, 9/25/16.
- No water was coming through the exterior walls.
- He believed the city sewer was overwhelmed by a rain storm and water was coming up at the kitchen sink drain.
- Water was not coming up through the the bathroom sink, toilet or shower.[4]

On September 29, 2016 Walker contacted USAA with additional relevant information:

- He had a plumber come to his home to determine the cause and remedy of what had happened at his home.
- "Sticks and bugs" were pulled from the piping.  The plumber went onto the roof to find that a vent was blown off.[5]
- Everything that clogged the line was from the open vent on the roof.
- The plumber replaced the line completely.[6]
- Walker was advised that the vent issue would be a separate claim from the 9/24/16 date of loss.
- Walker advised that Repair Solutions would be doing the rebuild work to address the loss.
- Walker did the water mitigation himself, and he was advised to send USAA his labor hours and receipts for purchases for the mitigation.[7]
- Walker was advised to submit the plumber's bill and to submit a rebuild estimate.[8]

---

[3] It should be noted that no photographs were submitted by Walker showing the flooring materials claimed to have been in place at the time of the loss.  There are no photographs available showing the home's interior before the Walker's demolition work commenced.

[4] Walker later confirmed this in his deposition testimony at page 353, lines 15-22.  Similarly, Brandy Newsom concurred in her deposition at page 78, lines 5-17.

[5] Walker testified in his deposition that this was taken out of context and that he was actually referring to a prior plumbing problem that pre-dated the 9/25/16 claimed date of loss.

[6] In the first few days following 9/26/16, Walker hired Dismuke Plumbing to unstop the kitchen sink and replace that portion of the line from the kitchen sink to the 4" underground drain line.  Dismuke's invoice is dated 9/29/16.

[7] Walker did not submit any documentation for hours worked.

[8] Walker did not submit any repair estimates in this matter until after the onset of litigation.

**EXHIBIT 23**

On October 5, 2016 Walker contacted USAA with additional relevant information:

- He could not use the kitchen for cooking or washing dishes.

On October 12, 2016 Adjuster Phillips inspected the property.    Relevant information includes:

- Walker told him the plumbing back-up came from the sink.
- Walker did not ever tell Phillips that the toilet was overflowing or leaking from its base.
- Phillips saw no evidence of sewage in the house and Walker did not point out any areas that he claimed were sewage.
- All flooring had been removed prior to his inspection.
- No damage to subfloors was observed.
- Walker told Phillips that the storage room had no flooring.

On October 12, 2016 Walker emailed eleven (11) pdf copies of receipts to USAA with the caption "items purchased for floor cover removal."[9]

On October 18, 2016 USAA's $3,928.55 damage estimate dated 10/18/16 was transmitted to Walker.  A payment of $1,928.55 was issued on the claim.

On October 19, 2016, Walker contacted USAA to report:

- Wood laminate flooring in the storage room that had a homemade step had been omitted from the estimate.
- Damage to the kitchen counter tops was not estimated for repair.
- No other missing items were communicated.

Robert Walker, either by deposition testimony or recorded statement, has established:

- There were no water issues before he left for his trip away.  There was no water damage to the property and no leakage from any fixture or appliance.
- He did not see standing water anywhere on the property when he returned from his trip.  There was no water on the floor at all.

---

[9] Walker submitted eleven (11) receipts.  The transaction dates on the receipts show the items, some of which are for food, were purchased after Walker testified that he had completed the removal of the flooring.

**EXHIBIT 23**

- There was a foul smell in the house.

- The kitchen countertops were not wet.

- The home had loose laid laminate floors in the kitchen, bathroom and storage room.

- He and Newsom started removing all the flooring the same night he called USAA to report the claim.

- The flooring was placed in a pile in the backyard.

- The floor removal was completed by sunrise the next day.[10]

- The kitchen drain overflowed and water leaked a couple of more times before the plumber was able to come out to make the necessary repairs and stop the cause of the problem.

- He took photographs of the loss scene but lost them.

- Terry Reese, a friend, cared for Walker's pets while Walker and Newsom were away.[11]

## OBSERVATIONS

I inspected the home on April 11, 2018 and again on September 26, 2018.[12]  My observations include:

1. The home's exterior presented evidence of considerable wear, tear and deferred and/or improper maintenance that challenged the integrity of the home's exterior envelope.  They represent likely pathways for water intrusion from time to time.  Such evidence includes, but is not limited to:

   - Dilapidated windows.

---

[10] Samples of the existing laminate were not kept.
[11] Reese later told an investigator hired by USAA that he neither saw nor heard water coming into the house nor did he smell anything unusual.
[12] A total of 450 photographs were taken to record the observed conditions during my site visits.  The photographs which appear in this report are intended to be a representation, but not a complete depiction of, all observations.

**EXHIBIT 23**



- Breaches in the exterior siding and also some attempts to seal breaches with expandable foam.



- Very little and ineffective crawlspace ventilation.
- Poor drainage about the home and a topography that supports surface water infiltration into the crawlspace.
- Ceiling stains that indicate roof leaks at the hot water tank vent.

2. The home's interior also presented evidence of considerable wear and tear. My observations include:

- No floor coverings in the home and exposed plywood in use at the floors.

**EXHIBIT 23**

- Localized staining on the plywood in front of the lower sink cabinet on the north wall indicative of a chronic contact with moisture.



- Localized staining on the plywood in and around the bathroom toilet and wet wall of the tub.   Again, this is indicative of multiple episodes of exposure to moisture.



- The height of the toilet rim was approximately 17" above the floor and the vanity top was approximately 33" above the floor.
- Localized staining on the plank wood floor in the daughter's bedroom.  The degree of staining did not occur as the result of a single exposure to liquid.
- Baseboards set on the floor with no space provided to accept a flooring finish.  The baseboards did not have staining that would

**EXHIBIT 23**

suggest they were impacted by water travelling on the surface of the floor.

- The living room and master bedroom floors were approximately 3.5" above the remainder of the home.

- It appeared that the failed wax ring seal at the base of the toilet had been addressed since the toilet was first seen by USAA adjuster Phillips.[13]



- Kitchen countertops were approximately 35" above the floor and in a state of disrepair. Pieces of the countertop edge were broken and missing. The countertop was not sealed properly to the backsplash. The underside of the countertop showed evidence of long term exposure to wetting.

- The floor of the sink cabinet had been removed and then covered with an access panel. Water discharge was ongoing.

---

[13] Walker v USAA Cas. Ins. Co. USAA-000153.

**EXHIBIT 23**

Case 5:17-cv-00752-D    Document 69-23    Filed 02/20/19    Page 11 of 43
Walker and Newsom v. USAA                                    November 20, 2018
USDC #17-CV-00752-D                                          Page 11



- The sink drain plumbing was improperly constructed and the sink had no vent.  These elements served to restrict drainage.  They are contrary to building code and good workmanship standard.



- The dishwasher was installed improperly.  Its discharge hose has no anti-siphon loop.
- The sink drained slowly.  I ran water into the sink for approximately 2 minutes after which the sink began to fill with water.  I stopped the water and in a matter of a few minutes the backed-up water slowly disappeared into the drain.
- The cabinet access panel was removed. Typically, there would have been subfloor underneath, but instead, access to the crawlspace was readily open.   I immediately detected heavy humidity escaping from the crawlspace.  The area underneath was

**EXHIBIT 23**

saturated with moisture.   I saw rotten and disintegrated wood structural members, wet CMU, rusted conduits, and rusted corrugated metal.  I observed where the kitchen sink PVC drain line exited through the crawlspace's north perimeter.





3.  The underground plumbing drain lines were inspected.  There were two branches: one to serve the bathroom and one to serve the kitchen.

   •  The bathroom branch line was scoped with a camera and video recorded.  No blockage was encountered.
   •  The camera was inserted into the kitchen branch line at the kitchen sink drain.

**EXHIBIT 23**

- Water continued to drain in the line as the camera made its way down the line.  The camera encountered a blockage, i.e. dead-ended, that would not allow it to pass.

- As the camera moved toward the dead-end point, it submerged in liquid present in the line that was still in the process of draining.

- The kitchen drain line was then excavated immediately outside the the north kitchen wall.  I observed the newer extension of 2" PVC pipe installed by Dismuke leading to a 4" Schedule 40 PVC line.

- I encountered a metal stake had been driven into the ground in the past in a manner that appeared to be a marker for the 90 degree elbow in the line.



Metal stake present

- The 90 degree elbow was then exposed.  A hole had been cut into the side of the elbow in an unconventional manner and covered in a makeshift manner with what appeared to be a scrap piece of vinyl flooring.  The characteristics and location of the hole suggests its purpose was to provide a "clean-out" opening for the insertion of a roto-auger to address obstructions in the line as they might arise from time to time.

**EXHIBIT 23**

Case 5:17-cv-00752-D   Document 69-23   Filed 02/20/19   Page 14 of 43
Walker and Newsom v. USAA                                                    November 20, 2018
USDC #17-CV-00752-D                                                          Page 14



- Next, the kitchen branch was excavated at the dead-end point.

- The 4" Schedule 40 kitchen branch line coming from the kitchen transitioned into a Schedule 20 line and intersected a 4" line leading from another house to the north, thus forming a tee. A large fracture was observed in the Schedule 20 line just downstream from the tee intersection. Dirt, grease, and significant tree roots were observed occluding the line and restricting flow.



- The tee was excised and examined. The section of pipe leading from the Walker kitchen was approximately 50% occluded with grease.

**EXHIBIT 23**



## ANALYSIS AND CONCLUSIONS

***Opinion #1:*** *Based upon my review of the file documentation and my site inspections, a naturally occurring clogging in the kitchen sink drain line and sub-standard plumbing construction set the stage for a plumbing water back-up to occur. There was no off-property surge in the city's main sewer line. The cause of the back-up was the introduction of freshwater or gray water into a kitchen drain line via the kitchen sink and/or the dishwasher. Any overflow that may have occurred was a Category 2 water discharge event.*

**1.1.** Based upon USAA's advice and with their approval, Walker engaged a local plumber to determine the cause of the plumbing back-up and reported discharge. This is an industry standard approach.

**1.1.1.** The plumber, Dismuke Plumbing (Dismuke), unstopped the kitchen sink and replaced the 2" drain line from the kitchen sink to the 4" drain line located underground. The work was done in the first couple of days following the reported date of loss, 9/25/16, and billed on 9/29/16.[14] I observed this newly installed plumbing drain line during my 9/26/18 site visit:

---

[14] Plfs' RFP Docs0094.

**EXHIBIT 23**



**1.1.2.** Dismuke also reported that on that same day his assistant went onto the roof and ran a cable auger through the line that serves the only bathroom at the home. Dismuke also replaced some angled pipes to allow for better flow. He observed that the kitchen sink was not plumbed correctly.[15] [16]

**1.1.3.** Dismuke observed the kitchen counters were not wet, and Walker did not report the counters being wet due to a kitchen sink overflow. Dismuke stated a water back-up through a surged sewer line would not rise up to the height required to impact and/or overflow onto a kitchen countertop without first manifesting itself at the lowest drain in the house.[17]

---

[15] Walker v USAA Cas. Ins. Co. USAA-000369.

[16] I observed the kitchen sink was not plumbed properly. The plumbing drain had an "illegal trap" and there was no plumbing vent. These latent defects are known to cause a plumbing system to drain slowly and clog more readily. Also, they allow all water to be pulled from the trap as the line drains. This allows sewer gas to escape into the interior of the home. This likely caused the smell the Plaintiffs encountered when they returned from their trip.

[17] Dismuke's conclusion is consistent with my experience in the industry and my opinion in this matter. During my site visit I confirmed the bath tub drain is the lowest drain in the house, followed by the rim of the toilet. Due to the design of plumbing drainage lines and hydraulics, a surge or a clog would cause a back-up in the lowest drain of the house first.

**EXHIBIT 23**

**1.2.**   Walker stated that after the plumber (Dismuke) made the repairs there were no further issues.[18]

**1.3.**   During my site inspection on 4/11/18, I ran water into the kitchen sink to test the drain.  It drained appropriately for 3-5 minutes and then began to back up.  Once the water was stopped, the water drained from the sink slowly.

**1.3.1.**   A camera was inserted into the kitchen drain line to observe the interior, but due to stagnant water and particulate, observations were difficult.

**1.3.2.**   The camera appeared to halt its advancement in the line at approximately 19'-20' MOL downstream, hereinafter referenced as "Point 19-20."

**1.4.**   During my site inspection on 9/26/18, the kitchen sink's 2" and 4" drain lines were excavated at two (2) locations:

- At the drain line's exit point from the kitchen's north exterior wall.  At this location, a breach in the sidewall of the line revealed deposits of grease in the line.  These deposits slowed the flow of kitchen water through the line.
- At Point 19-20.  There was also a breach in the line at this location that revealed deposits of grease, dirt and tree roots.  These deposits also slowed the flow of kitchen water through the line. Slower flow through the line exacerbates further deposits of grease and sediment.
- The volume of grease and tree root deposits observed takes considerable time to manifest itself to the degree observed.
- The deposits are cumulative and caused drainage to become slower and slower over time.  These slower draining conditions usually become noticeable to a homeowner and continue to become worse with time as the deposits accumulate.
- It is more likely than not that Dismuke was knowledgeable about the grease deposits when he performed his work to unstop the kitchen sink and replace a section of the underground drain line.  This is because Dismuke's new 2" line tied into the old 4" line very near the elbow where grease deposits were first observed.
- It is also much more likely than not that the grease deposits became worse in the approximate two (2) years that transpired between Dismuke's work and my observations on 9/26/18.

---

[18] Walker v USAA Cas. Ins. Co. USAA-000368.

**EXHIBIT 23**

**1.5.**    Line surges sometime occur in a municipal's main sewer system.  Surges can cause sewage to back up in the drains of neighborhood homes.  The surges show themselves first in the lowest level drains.    However, Walker's plumbing back-up was not due to a surge in the city's main line.

**1.6.**    Records obtained from the City of Duncan indicate there were no calls from Walker or any other municipal resident voicing a complaint concerning surges or back-ups in the city's main sewage lines at or about the reported date of loss.[19]  At any rate, such a surge would have caused sewage to appear in the bathtub first, and this did not occur.

**1.7.**    Absent a line surge, introducing water into the kitchen plumbing drain would be the only way the Walker kitchen drain line could have backed-up and caused a discharge.  The sources of water would be the fresh water supply, activating the dishwasher, or disposing of a liquid via the sink drain.  Simply having a blockage would not be sufficient.  It also required the introduction of a sufficient volume of liquid at the sink and/or the dishwasher in order to reach the blockage, fill the line completely, and then accumulate in the basin of the sink and/or dishwasher.[20]

**1.7.1.**    It is more likely than not that Robert Walker and/or his wife, Brandy Newsom, caused water to be introduced into the kitchen sink and/or the dishwasher in sufficient volume to cause the plumbing back-up they allege occurred when they returned home.  Robert Walker testified:

- There were no issues with the plumbing when they left town.
- Other than the caretaker, Terry Reese, no one was in the home while the Plaintiffs were away.  Reese only came in the front door to feed the animals and did not go into the kitchen.

**1.7.2.**    Walker claimed he and his wife found very dirty water "coming up" through the dishwasher and kitchen sink when they returned home.   Walker testified that he and his wife cleaned up water back-up fluid on 9/26/16, the day following the claimed date of loss, and that they saw "water coming up in front of their eyes" on that same date.[21]   For reasons

---

[19] Walker v USAA CIC City of Duncan-0001-0004.

[20] I observed the sink draining, albeit more slowly than is typical.  It should be noted that an overflow could only occur if liquid was being introduced into the drain at a faster rate than it could be drained away.  Based upon my site observations, I believe the speed of draining at the kitchen sink/dishwasher has become slower and slower with time.

[21] Robert Walker deposition testimony April 9, 2018, page 206, line 24 through page 211, line 3.

**EXHIBIT 23**

previously outlined in this report, this would not be possible without a water source to introduce more water into the drain system.  Such an introduction of additional water could only be made at the sink and/or dishwasher because those are the only fixtures served by the subject drain line.  Such an introduction could only be made by someone pouring liquid into the sink or using the dishwasher.

**1.7.3.**    In the case of a back-up occurrence, there is a direct relationship between the volume and speed of the liquid introduced into the semi- blocked drain and the volume and speed at which it may spill out onto the surrounding surfaces, e.g. the floor.  Once the semi-blocked or blocked system is filled to capacity and as additional units of water are introduced, additional units are spilled.  Consequently, it is unlikely that Walker introduced the volume of water required to impact all the rooms he claims without it being immediately apparent that water spillage was simultaneously occurring.  In other words, the more liquid in, the more liquid out.

**1.7.4.**    The water that Walkers claimed was "coming up" most likely resulted from their attempts to use the dishwasher.  The reasons are as follows:

- In almost all homes the dishwasher and the kitchen sink share the same drain line.  This is the case at the Walker home.
- Upon starting a cycle, a dishwasher first purges any water in its system via a drain pipe that ties into the side of the garbage disposal or the kitchen sink drain tail piece.  The kitchen drain may look empty at the start of this cycle, but if the drain line is already nearly full when the cycle begins, the water being pumped out of the dishwasher will appear to "come up" and be visible in the kitchen sink.  The standing water would then slowly drain and "go back down" or recede.
- In the next cycle, the dishwasher takes in fresh water for the wash cycle and mixes it with soap.  The water/soap mixture is often light blue, green or milky white.  Once the wash cycle is complete, the used water is evacuated and pumped out again to the kitchen drain.  Again, the kitchen drain may look empty at the start of the cycle because the last introduced waste water has receded, but if the drain is already nearly full, it cannot accept the volume of the wash cycle water (and food particles grease, etc.) being pumped to it.  As a result, blue, green or milky wash water will appear to "come up" in the sink drain.  This can be seen in Plfs' RFP Docs0244.  It "comes up" in the sink because the dishwasher is designed to

**EXHIBIT 23**

collect its soon-to-be-discharged water in the base of the unit and pump it uphill against gravitational force.  It quickly begins to drain, or recede and disappears.  This is shown in Plfs' RFP Docs0245-0246.

- The dishwasher fills again with water in preparation for the rinse cycle.  Again, at the end of the cycle, the dishwasher will pump evacuated water uphill and attempt to force it into the drain line.  A slow draining drain can lack the capacity to handle the water.  As a result the discharged water will appear to "come up" in the sink.

**1.7.5.**   The Walker's dishwasher was improperly installed.  The drainage line did not have a required anti-siphon loop.[22]

- The sub-standard installation made it probable that from time to time water drained, or siphoned, from the sink into the lower cavity of the dishwasher unit.  This condition can be seen in Plfs' RFP Docs0247.[23]
- Without an anti-siphon loop the dishwasher would be contaminated with bacteria that grow in the undischarged water.
- Its absence can cause the dishwasher to fail to evacuate all its discharged waste water.

**1.7.6.**   The improper installation of the dishwasher would prevent the sink water from overflowing the rim of the sink and impacting the kitchen countertops and cabinet base.  At any rate, the conditions of deterioration that I observed at the kitchen cabinets would not result from a single water impaction event.

─────────────────────

[22] Walker v. USAA Cas. Ins. Co. USAA-00237, Photo #11.

[23] It should be noted that the depiction in Plfs' RFP Docs0247 could also be the result of opening the door to the dishwasher mid-cycle.  This would halt the dishwasher's usual functioning and cause stagnant water to accumulate and, given adequate time, would lead to bacteria growth and a putrid smell.  This could be confused with a raw sewage back-up.

**EXHIBIT 23**

**1.8.**    A water discharge that may have occurred at the kitchen sink and/or
dishwasher would be considered to be a Category 2 event as defined by
the Institute of Inspection, Cleaning and Restoration (IICRC).

**Category 2** – Category 2 water contains significant contamination and has the potential
to cause discomfort or sickness if contracted or consumed by humans.  Category 2 water
can contain potentially unsafe levels of microorganisms or nutrients for microorganisms,
as well as other organic or inorganic matter (chemical or biological).  Examples of
category 2 water can include, but are not limited to: discharge from dishwashers or
washing machines; overflows from washing machines; overflows from toilet bowls on
the room side of the trap with some urine but no feces; seepage due to hydrostatic
pressure; broken aquariums and punctured water beds.
The cleanliness of Category 2 water can deteriorate for many reasons, including but not
limited to: contact with building materials, systems, and contents; mixing with soils and
other contaminants.  Factors that influence the potential organic and inorganic load in a
structure include the age and history of the structure, previous water losses, general
housekeeping, the type of use of the structure, and elapsed time or elevated temperature.


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


**_Opinion #2:  There is no evidence that Category 3 water overflowed any of
the plumbing fixtures and impacted the bathroom at the Walker home while
they were away from the home in late September.  A necessary requirement
for a sewer back-up is a municipal sewer line surge or the introduction of
additional liquid into the system by the occupants, but this could not have
occurred when Walker and Newsom were gone._**

**2.1.**    The IICRC defines a Category 3 water discharge event as follows:

**Category 3** – Category 3 water is grossly contaminated and can contain pathogenic,
toxigenic or other harmful agents.  Examples of Category 3 water can include, but are not
limited to: sewage; toilet backflows that originate from beyond the toilet trap regardless
of visible content or color; all forms of flooding from seawater; ground surface water and
rising water from rivers or streams, and other contaminated water entering or affecting
the indoor environment, such as wind-driven rain from hurricanes, tropical storms, or
other weather-related events.   Such water sources may carry silt, organic matter,
pesticides, heavy metals, regulated materials, or toxic organic substances.

**2.2.**    As previously established herein, a line surge did not occur.

**2.3.**    A blockage and/or slower flow in the kitchen's drain line would not have
had any effect on the drainage lines serving the bathroom.   The kitchen

**EXHIBIT 23**

drainage line is a separate tributary line that would not impede the flow of sewage water from the toilet fixtures.

2.4.    A Category 3 sewage would back-up first in the bathtub before it would back up and overflow the toilet.  This did not occur.  The basis for this conclusion includes:

- Due to the design of plumbing drainage lines and hydraulics, a back-up would occur in the lowest drain in the house first.
- Robert Walker testified that water was not coming up through the bathroom sink, toilet or shower when he and his wife returned from their trip.[24]
- Brandy Newsom also testified that she had not seen an overflow from the bathtub.

2.5.    Walker and Newsom testified that they were away for a few days and discovered back-up issues that occurred while they were away.  This is counterintuitive because in the absence of a surge, a back-up will not occur unless additional liquid is introduced into the home's drainage system.  In this matter, only introducing water into the plumbing fixtures would cause a back-up in those same fixtures.

2.6.    However, there is evidence that the wax ring seal at the toilet was deteriorated and allowing leakage of sewage during toilet use.[25]

- Walker testified that he observed water coming from the base of the toilet a week or two after he returned home.
- A photograph taken by Walker shows the wax ring seal failed.
- He took the photograph to depict the broken seal.[26]
- The seal fails over a period of time due to age, wear and tear.
- The photograph shows the sewage impaction is localized and the result of the usual seepage that occurs when the wax ring seal fails over time.
- The seepage from the failed wax ring seal usually occurs to some degree each time the toilet is flushed.

---

[24] Robert Walker deposition testimony April 9, 2018, page 353, line 15-22.
[25] A "wax ring" is installed at the base of a toilet, sandwiched between the toilet and the drain pipe to which it is connected.  It creates a watertight seal; however, age and use, along with some elements of wear and tear, typically cause the seal to fail over time.  In this case, maintenance must be performed to replace the wax ring.
[26] Robert Walker deposition testimony April 9, 2018, page 213, line 3-18.

**EXHIBIT 23**

**2.7.** Walker confirmed with Brenda Reavis-Alves, an investigator with VRC Investigations (VRC), on 11/30/16 that their issues with the slow draining toilet started after the issues with the kitchen sink. He said that toilet issues ceased after Dismuke did his repairs.[27]

**2.8.** Walker did not advise Dismuke of any issue with the toilet overflowing nor did he request any toilet repairs when Dismuke was at the Walker home to unstop the kitchen sink following the Walkers' return.[28]

**2.9.** I did not observe a horizontal stain line on the unpainted baseboards in the bathroom. Such a line would be expected if the bathroom floor had been impacted by a Category 3 sewage back-up.

**2.10.** The plywood subfloor showed signs of localized staining around the toilet and at the faucet end of the tub. The former appears to be the result of localized leaking at the fresh water valve and the failed wax seal at the base of the toilet. The latter suggests water bypassing the shower curtain as the occupants showered. I did not observe the more uniform stain pattern that would be indicative of a toilet overflow.



Localized staining due to failed wax ring

---

[27] Walker v USAA Cas. Ins. Co. USAA-000368.
[28] Walker v USAA Cas. Ins. Co. USAA-000369.

**EXHIBIT 23**



Area between tub (top of photo) and the vanity (bottom of photo) near tub faucet

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

***Opinion #3:*** ***As previously established, if any back-up at the kitchen sink and/or dishwasher occurred, it would be caused by introducing additional liquid into the system and/or attempting to operate the dishwasher. Any associated spillage onto surrounding areas would be noticeable relatively quickly. Hence, if spillage occurred it was likely of low volume and would have been localized to the kitchen. It would have manifested itself near the kitchen sink base cabinet within a limited area and could have been easily addressed.***

**3.1.** When a blockage or slowing draining line situation exists, liquid must be introduced before liquid will overflow and spill out.

**3.2.** In this matter, the only point for water entry into the sink/dishwasher drain line was the sink or dishwasher.[29]    The water introduced at this point would encounter the blockage and/or slow draining pipe and then begin to back-up. Once a sufficient volume of water was introduced, spillage would begin. The spillage would be obvious before much water was spilled. The spillage would prompt the the person introducing the water to stop, thus minimizing the volume.

---

[29] These two (2) are expressed together because they are both tied to the same drain line and for all practical purposes at the same point. Refer to left diagram at 1.6.5, above.

**EXHIBIT 23**

**3.3.**    If spillage occurred, it was likely a volume too slight to reach the daughter's bedroom, bathroom, storage room and hallway.  Moreover, a sealed, raised threshold separated the kitchen from the storage room.  At any rate, even under the Plaintiffs' causation theory it would have been impossible for the water to reach the living room or the master bedroom because these two rooms are at a higher elevation than the rest of the home.

**3.4.**    Walker claims the wood flooring at his daughter's bedroom had to be replaced because it became spongy as a result of the water discharge he claims occurred. This is false.  The poor condition of the subfloor and joist supports resulted from a wet and substantially unventilated crawlspace.  I observed:

- An earthen mass grade about the perimeter of the house that allows water to get under the house.
- There are breaches in the exterior envelope of the house that provide a pathway for water to enter the crawlspace.
- Once under the house, the water has no mechanism to drain.   The crawlspace ventilation is below industry standard, minor and insufficient to create a cross draft through the crawlspace.
- Soils in the crawlspace are in too close proximity to the home's wooden foundational elements.
- Wet and rotting structural members.
- Water saturated CMU .
- Rusted conduits.
- Rusted corrugated sheets being used to hold the earth around the home from collapsing into the crawlspace.
- Dampness and high humidity levels.

       These conditions set the stage for the wood joists, wood flooring and wood supports to rot at the daughter's bedroom.  The rotting affected the structural capacity of the wood.  These are the effects of a long-term systemic problem with how the house was constructed and maintained.  They are not the result of a water discharge event as claimed.  These deleterious conditions are also affecting the kitchen structural members and subfloor and likely all other wood members of the crawlspace.

**3.5.**    Walker testified that he also replaced the subfloor of the master bedroom in 2018, but not due to the claimed loss.   The need for this work

**EXHIBIT 23**

demonstrates the systemic damage the home's crawlspace is having on the structure.  The daughter's bedroom and the master bedroom share the same crawlspace and its deleterious effects, even though the Plaintiffs claim one was affected by their claim and the other was not.

3.6.   Adjuster Phillips' 10/12/16 photographs show the property has been challenged by water impaction unrelated to Plaintiffs' claimed cause of loss:

- Staining on the kitchen's plywood subfloor indicative of foot traffic patterns.  The rectangular stain pattern on the kitchen floor suggests that an area rug was in place over the plywood in front of the sink.[30]
- Staining and discoloration on the kitchen subfloor indicative of multiple water impaction events that occurred over an extended timeframe.
- Staining at the base of the plywood sheathing in the storage room indicative of multiple exposures to exterior surface water and breaches in the  room's exterior envelope.[31]
- Staining at some of the seams of the exterior plywood in the storage room indicates exterior water is bypassing the caulk Walker applied.
- Staining at the daughter's plank wood floor indicative of long term damages from water or other liquids, e.g. pet urine.
- Two generations of wood plank flooring were present in the daughter's bedroom, one much older and more weathered and stained.
- Foam sealant and caulking applied in an attempt to seal the interior space from the humid environment of the crawlspace.
- Staining at the plywood subfloor at the base of the toilet indicative of the failed wax ring seal.

3.7.   It is unlikely that the sheetrock on the lower areas of the storeroom's walls was damaged as Walker claims; instead, it was damaged from water mitigating through the base of the exterior walls. Observations that support this conclusion are:

- The storeroom is an add-on to the rear of the home.  The concrete floor upon which the room sits was once a concrete patio.  It is lower than the rest of the house and sits at roughly the same elevation as the ground

---

[30] I observed this pattern during my site visit on 4/11/18.
[31] Robert Walker testified that he applied caulk to the inside surfaces of the storage room's exterior sheathing to prevent water intrusion through the exterior wall into the home.

EXHIBIT 23

around it.  This sets the stage for water infiltration at the base of the perimeter walls.

- Earth was mounded up on portions of the exterior walls in an attempt to drain ground surface water away from the structure.  This puts untreated wood in direct and continuous contact with the earth and sets the stage for water infiltrating from a higher exterior elevation to the interior.  There is evidence in my photographs and Adjuster Phillips' photographs revealing staining indicative of chronic water infiltration from the exterior.

- The concrete patio was not designed or constructed in a manner that made it suitable to be enclosed and resist water infiltration.

- The application of expandable foam and caulking on the interior surface of the exterior walls, as well as Walker's testimony that same was installed by him to keep water out, is consistent with my conclusion that this room is water challenged on a regular basis unrelated to the claimed loss.

- I observed other pathways for exterior water to infiltrate the storage room and Walker's efforts to halt it.

3.8.   Walker's claim that the alleged water discharge event caused what he believed to be mold growth is untenable.  The darken stains he noted, such as those at the base of the kitchen cabinets, are the result of the wood's repetitive exposures to liquid.  In order for mold growth to achieve this degree of visual presence, the wood would need to be wet much longer than the 4 day period in which the Plaintiffs were away.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

***Opinion #4:  If the loss event claimed by Walker actually occurred, it was a Category 2 water event and as such, USAA followed industry standard methods of determining the proper scope of work and cost to restore the alleged damages.  However, Walker failed to engage the usual and customary steps of moving the process forward and restoring his home.***

4.1.   During Walker's initial call, USAA advised Walker to contact a plumber to assist in determining the cause of the loss.  In matters of plumbing back-ups where the origin is not known, this is often a standard practice.  Walker contacted Dismuke who determined the cause was a stopped up sink drain line.  The problem was rectified and a section of the line was replaced.

**EXHIBIT 23**

**4.2.** Based upon my review of the documents in this matter and observations I made on site, I believe Dismuke was correct in his assessment. I observed the newly installed section of drain pipe installed by Dismuke.

**4.3.** USAA's adjuster Phillips appears to have made an inspection of the property using common practices. The rooms that Walker alleged were affected by the plumbing back-up were measured, evaluated and photographed.

**4.4.** Walker told USAA that the plumbing back-up occurred at the kitchen sink area and not the bathroom. This was borne out by Dismuke's inspection, work and interaction with Walker. Consequently, any spillage that may have occurred was a Category 2 event.

**4.5.** USAA utilized Xactimate, a software estimating program which I use in the regular course of business, to formulate its estimate. The Xactimate pricing database selected, OKLA8X_OCT16, is appropriate considering the date of the inspection and the geographic locale in which the Walker property is located.

**4.6.** USAA's estimate reflects a 10% overhead and 10% profit added to the estimate, a total of $654.88. This is known in the restoration industry as GCOP, general contractor's overhead and profit, and is an industry standard. It provided funds for Walker to hire a restoration contractor of his choosing or compensate him for his efforts to act as his own contractor.

**4.7.** Based upon photography, other available information, and my site inspection, I believe the USAA estimate total was adequate to restore the plumbing back-up damages; however, I have determined that some of the individual estimate items are more than what will be required.

**4.8.** Per my experience in the industry, I know it to be a customary process for a carrier such as USAA to create an estimate and make an initial payment to advance the restoration process and allow work to start. USAA did so in this matter.

**4.9.** Property damage estimating is not an exact science; hence, sometimes the initial damage estimate is adjusted as the process moves forward to account for inadvertently omitted items, discovery of additional damages,

**EXHIBIT 23**

etc.  These adjustments are often referred to as supplemental estimates. When a contactor or homeowner makes a claim for supplemental items, the insurance carrier usually goes through a verification process before adding additional items to the damage claim.

**4.9.1.** Walker made a supplemental request of USAA.  He believed three items were omitted from USAA's damage estimate.  My comments are in italics:

- Kitchen countertops.  *As previously outlined in this report, the countertops would not have been impacted by a plumbing back-up at the sink.  At any rate, kitchen countertops are made to get wet. Water from a sink, either fresh water or back-up water from a single event would not damage the countertops.  I observed the countertops were in a state of disrepair from wear, tear and poor maintenance unrelated to Walker's claim.*



- Laminate flooring, first at the entire storage room, but then reduced to just at one (1) step that leads from the kitchen to the storage room.  *There is no evidence that it was ever in place. Walker claimed he removed the step's laminate, discarded it, and replaced it with a piece of old carpet.  Due to the impracticality of "loose laying" unattached, small pieces of wood laminate on a small step, this claim is unlikely.[32]  My observations of the carpeted step*

---

[32] The term "loose laying" is an expression used in the construction industry to describe placing laminate flooring materials without adhesive or mechanical attachment.  "Loose laid" is how Walker described the

**EXHIBIT 23**

*suggest that the worn carpet has been in place for an extended period of time.*

- <u>Hot water tank door.</u> *There is no door on the hot water tank closet and no evidence that it was ever in place. At any rate, the door would not have been impacted by water even if one were to adopt the Plaintiffs' theory in this matter.*

**4.9.2.** During the course of the claim and litigation, Walker had made two (2) other claims. My comments are in italics:

- <u>The water damaged building materials he removed from the home required more than the two (2) pick-up loads estimated by USAA.</u> *My volume calculations indicate that the USAA estimate was easily more than sufficient in this regard.*
    - ❖ Removed floor/wall materials, (590.02 SF x .0825)  = 48.68 CF
    - ❖ Removed insulation (136 SF x .165)                = 22.44 CF

    Total                                                   71.12 CF

    *Since the size of even a compact pick-up bed is 42.12 CF, USAA's allocation of two pick-up trucks to transport less than 75 CF of material was reasonable. The USAA unit cost which includes dump fees was also more than needed because Walker testified that he did not have to pay dump fees.*

- <u>The valve on the hot water heater was broken and Dismuke repaired it.</u> *There is no record that Dismuke did this work or billed for it. Walker testified that Dismuke's work performed on or before 9/29/16 was the last work done at the home by a plumber. I observed that the hot water tank was replaced on or about 11/26/16.*

**4.10.** Later, Walker told VRC that the kitchen cabinets, some drywall at the bathroom, and the storage room floor were damaged.[33] My comments are in italics:

- <u>Kitchen cabinets.</u> *There is no evidence the kitchen lower cabinets were damaged from single episode of water overflowing the sink or discharging underneath from the dishwater. Adjuster Phillips' and VRC's photographs show evidence of wear, tear, poor*

---

installation of the laminate flooring. I confirmed that the wood step has no remains of adhesive or signs that fasteners were used.

[33] Walker testified in his deposition that the storage room floor was exposed concrete with not finished flooring, e.g. wood laminate, at the time of the claimed loss

**EXHIBIT 23**

> *maintenance, and repetitive water impaction events. My observations at the site confirmed these conditions.*
>
> - <u>Drywall at the bathroom.</u>  *There is no evidence of drywall damages. Water flowing on the floor would first come into contact with the unpainted bathroom baseboards which are caulked to the floor. The baseboards show no evidence of stains that would indicate water flowed across the floor.*
> - <u>Storage room flooring.</u>  *Walker retracted this claim in his deposition. There is no evidence that the storage room had flooring.*

**4.11.**   In this matter Robert Walker decided to restore his own home and so advised USAA.  A homeowner's decision to do his own work is a somewhat common occurrence, and it has been my experience that this is one of the policyholder's options.  Rarely, if ever, does the insurance carrier hire the restoration contractor. The decision either to self-perform the work or hire a restoration contactor(s) rests with the policyholder.

**4.12.**   Walker failed to participate with USAA in the usual manner that I have seen in my experience as a restoration contractor.  In a typical manner USAA requested certain steps.  Although he was advised of USAA's customary requests, he failed to do the following:

- Take photographs of the loss site to capture images of the damages before he started the work.  Walker claims photographs were taken but lost; hence, there is no evidence to support his claim of:
  a. The geographical extent of the plumbing back-up.
  b. The presence, location, type or damage to the laminate floor he said was on the floor.
  c. The presence of wet sheetrock in the storage room.
  d. The damage to the hot water tank door.
- Submit a log of the hours he spent on mitigation efforts.
- Provide a "rebuild" or damage repair estimate.

**4.13.**   Even now, more than 2 years after USAA tendered funds, the Plaintiffs have done little to advance much of the estimated work at the home.

- As an example, except for the application of an anti-microbial agent, no construction work described by the USAA estimate has been done at the storage room, hallway, or bathroom.  It should be noted that it

**EXHIBIT 23**

appears that correcting the failed wax ring seal at the bathroom has been done.

- Little work has been done in the kitchen; however, unrelated to the Plaintiffs' claim the hot water tank was replaced on or about 11/26/16.
- None of the work estimated for the bedroom was performed; yet, work unrelated to the loss was done—texturing and painting of walls, painting woodwork, and making structural refurbishments and/or replacement of the floor joists and floor decking.[34]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

***Opinion #5:***   *Kevin Hefley (Hefley) with Dason Fire & Water Restoration submitted a report and estimates in this matter.  Hefley's 3/6/17 estimates are based upon scopes of work that go well beyond the restoration of damages that may have been caused by the reported event.  The estimates are woefully inaccurate and without merit.  They misrepresent what would be required to address a plumbing back-up at the kitchen sink, even assuming a back-up occurred.  The estimates are unreliable due to the invalid assumptions upon which they are based.*

**5.1.**   Hefley's estimate includes repair work on components that were not damaged by the plumbing back-up.  Examples include:

Kitchen
- Subfloor plywood
- Clean/seal floor joist system
- Replace and paint baseboard
- Paint doors and door jambs
- Replace and paint door casing
- Prime and paint walls
- Replace lower cabinetry
- Replace countertop and backsplash
- Replace angle stops
- Replace dishwasher
- Rebuild laminate next to hot water heater

Storage room (denoted as "Rear Exit" on Hefley's estimate)
- Drywall
- Texture and paint drywall

---

[34] As previously outlined, these efforts were necessary due to failures brought on by systemic design, construction and maintenance issues with the home unrelated to the claim in this matter.

**EXHIBIT 23**

- Paint doors, door jambs and related trim

Hall
- Subfloor plywood
- Clean/seal floor joist system
- Replace and paint baseboard
- Paint doors and door jambs
- Replace and paint door casing

Bathroom
- Subfloor plywood
- Clean/seal floor joist system
- Replace and paint baseboard
- Paint doors and door jambs
- Replace and paint door casing
- Replace vanity
- Reset vanity top
- Angle stop valves
- Clean washer and dryer

Daughter's Bedroom
- Fir subfloor
- Clean/seal floor joist system
- Replace and paint baseboard
- Paint doors and door jambs
- Replace and paint door casing

**5.2.** Hefley includes some items that did not exist at the Walker home. Examples include:

- Batt insulation at the walls of the Storage Room.
- Base shoe at the hallway, bathroom, kitchen and daughter's bedroom
- 5/8" tongue and groove plywood sheathing at the daughter's bedroom

**5.3.** Hefley used the Xactimate estimating program in a manner that unnecessarily inflated the estimate. Examples include detaching the kitchen cabinets, countertop and vanity at elevated Xactimate unit prices that are based upon the retention/reuse of the item while his rebuild estimate simultaneously calls for their full replacement.

**5.4.** Hefley's estimate is based upon the misguided notion that the claimed plumbing back-up is a Category 3 water loss when there is no evidence to support it. The estimate contemplates evaluating, inventorying, packing, moving, storing and resetting personal contents from areas that were not impacted by the plumbing back-up. It prices water mitigation and clean-up

**EXHIBIT 23**

Case 5:17-cv-00752-D   Document 69-23   Filed 02/20/19   Page 34 of 43
Walker and Newsom v. USAA                                    November 20, 2018
USDC #17-CV-00752-D                                                 Page 34

that Walker claimed he did in the first 24 hours for which he claims cost incurred but never submitted records for hours worked.

**5.5.**  Hefley's excessive scope of work drives his errant conclusion that the work required will render the house uninhabitable for three (3) months.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I understand that discovery is in progress and I reserve the right to supplement this report to address additional information made available to me and to provide illustrative exhibits at a later date.  Please find attached as a part of this report my current Curriculum Vitae which lists publications I have authored during the last ten (10) years and all cases in which I have given testimony, both at deposition and trial over the last four (4) years.  It establishes my qualifications and my compensation.

Sincerely,

Michael J. Berryman
BERRYMAN ENTERPRISES, INC.

18-02-02E.Report

**EXHIBIT 23**

## <u>CURRICULUM VITAE</u>

**Name:**                     Michael J. Berryman

**Born:**                      September 23, 1957
                              Lincoln, Nebraska

**Occupation:**           President and Chief Executive Officer
                              Berryman Enterprises, Inc.
                              General Contractor / Consultant
                              426 N.W. 5th Street
                              Oklahoma City, Oklahoma  73102

**Formal Education:** B.A., Vanderbilt University 1979
                              Molecular Biology

**Licenses:**               Qualifying Agent (QA) and/or Qualifying Managing Employee
                              (QME) for licensure and/or operating authorization in the
                              following states:

|  |  |
|---|---|
| Louisiana | Arkansas |
| Virginia | Mississippi |
| West Virginia | Nebraska |

**Building Codes:** UBC              Uniform Building Code
                              BOCA            Building Officials and Code Administration
                              SBCCI           Southern Building Code Congress International
                              IRC               International Residential Code
                              IBC               International Building Code


**Compensation Structure:**  Expert services and review, study, estimation and
written opinions shall be billed at a rate of $245.00/ hour.

Expert services at deposition and trial shall be billed at $375.00/hour.

**EXHIBIT 23**

**Previous Depositions and Court Appearances:**

1) AC Dwellings, LLC v.
John W. Shawver, III and Carrie M. Shawver
Case No. 71 527 E 00367 13
American Arbitration Association
Deposition Date: August 26, 2014

2) Bruce and Mary Ann Erickson v.
A.O. Smith Corporation et al.
Case No. 13-L-1962
In the Circuit Court Third Judicial Circuit Madison County, Illinois
Telephonic Deposition Date: October 21, 2014

3) Maria D. Rodriguez v.
State Farm Lloyds and Luke Andrew Garcia
Case # DC-13-00992-K
192nd Judicial Court Dallas County, Texas
Trial Testimony Date: October 29, 2014

4) Gwen LeClerc Revocable Living Trust v.
Candelaria Foster, LLC
Case No. 01-14-0000-5564
American Arbitration Association
Deposition Date: January 6 and 7, 2015

5) Gwen LeClerc Revocable Living Trust  v.
Candelaria Foster, LLC
Case No. 01-14-0000-5564
American Arbitration Association
Trial Testimony Dates:  Feb. 26 and 27, 2015

6) Cynthia Stokes v.
Asian Restaurant, LLC
Case No: CJ-2013-2695
In the District Court of Oklahoma County
State of Oklahoma
Deposition Date:  June 26, 2015

7) Tanya Read v.
Southwestern Roofing & Metal, Inc., et al.
Case No:  CJ-2011-8864
In the District Court of Oklahoma County
State of Oklahoma
Deposition Date:  July 7, 2015

**EXHIBIT 23**

8)      Martin Brons and Donna Brons v.
        3M Company, et al.
        LASC Case No. BC565859
        Superior Court of the State of California
        County of Los Angeles-Civil Central West
        Deposition Date:  7/24/15

9)      Stephen R. Mastin, Peter Ricci, et al., v.
        A.O. Smith Water Products Co. Inc., et al.
        Index No. 190024/14 and 190424/13
        County of Erie
        Supreme Court of the State of New York
        Deposition Date: 7/28/15

10)     Martin Brons and Donna Brons v.
        3M Company, et al.
        LASC Case No. BC565859
        Superior Court of the State of California
        County of Los Angeles-Civil Central West
        Trial Testimony Date: 9/15/15

11)     Chris and Breann Lander v.
        American National Property & Casualty Co., Armstrong Bank and
        Rodney Cottrell
        Case No. CJ-2014-202
        In the District Court of Sequoyah County
        State of Oklahoma
        Deposition Date:  9/21/15

12)     Jordan Bundy v.
        Memport Landing Owner's Association, Inc.
        CJ-2014-3797
        In The District Court of Oklahoma County
        State of Oklahoma
        Deposition Date:  9/22/15

13)     Metro Mart, LLC v.
        North Star Mutual Insurance Co.
        Case No. 14-CV-1210-F
        United States District Court
        Western District of Oklahoma
        Deposition Date:  11/06/15

**EXHIBIT 23**

14)   Larry Winslowe Lee and Susan Provost Lee v.
      AK Steel Corp., et al
      File No.:5:13-CV-00826-FL
      United States District Court for the Eastern District Of North Carolina
      Western Division
      Deposition Date: 11/18/15

15)   Maverick Mart, LLC v.
      North Star Mutual Insurance Co.
      Case No. 14-CV-01165-F
      United States District Court
      Western District of Oklahoma
      Deposition Date:  12/09/15

16)   Flanagan Quality Homes, and Bill Flanagan v.
      Samuel Lee Daube, and Christi Daube, husband and wife
      Case No. CJ-2014-249
      In The District Court of Carter County
      State of Oklahoma
      Deposition Date:  01/18/16

17)   Jerry and Christina Young v.
      State Farm Fire and Casualty Company
      Cause No.  CJ-2012-905-TS
      In the District Court of Cleveland County
      State of Oklahoma
      Trial Testimony Date:  1/29/16

18)   Ronnie and Sandi Bliss v.
      Shelter Insurance Company
      Case No. CJ-2013-275
      In the District Court of Payne County
      State of Oklahoma
      Deposition Date: 04/04/16

19)   Amanda LaBrier v.
      State Farm Fire & Casualty Company
      Case No: 15-04093-NKL
      United State District Court
      Western District of Missouri Central Division
      Deposition Date: 05/12/16

**EXHIBIT 23**

20)    Roger Bain v.
       State Farm Fire and Casualty Company
       Case No: CJ-2013-4032
       In the District Court of Oklahoma County
       State of Oklahoma
       Deposition Date: 05/24/16

21)    Global One Engineering, LLC v.
       SiteMaster, Inc.
       Case No: 15 CV-583-CVE-FHM
       United States District Court for the
       Northern District of Oklahoma
       Deposition Date:  08/30/16

22)    Roger Bain v.
       State Farm Fire and Casualty Company
       Case No:  CJ-2013-4032
       In the District Court of Oklahoma County
       State of Oklahoma
       Trial Testimony Date:  12/07/16

23)    Global One Engineering, LLC v.
       SiteMaster, Inc.
       Case No. 15 CV-583 CVE-FHM
       In the United States District Court for the
       Northern District of Oklahoma
       Trial Testimony Date:  12/09/16

24)    Jeffrey Bailey, Susan Hicks and Don Williams v.
       State Farm Fire and Casualty Company
       Case No. 14-CV-00053-HRW
       United States of District Court
       Eastern District of Kentucky at Ashland
       Deposition Date: 12/16/16

25)    Bill Flanagan v.
       Lee Daube, et al
       Case No. CJ-2014-249
       In the District Court of Carter County
       State of Oklahoma
       Trial Testimony Date: 02/13/17

**EXHIBIT 23**

26)     Phillip & Charla Bird v.
        Barnett Building Co. and R.J. Byrd Construction, Inc.
        Case No:  CJ-2010-1605
        In the District Court of Cleveland County
        State of Oklahoma
        Deposition Date:  02/22/17

27)     Nolan Lamb v.
        Certainteed Corporation, et al.
        Case No.  MSC 15-00057
        Superior Court of California
        County of Contra Costa
        Deposition Date:  02/27/17

28)     Mitchell and Melanie Payne v.
        Republic Insurance Company
        Case No. CJ-2013-3894
        In the District Court of Tulsa County
        State of Oklahoma
        Trial Testimony Date: 04/11/17

29)     John and Laura Foegelle v.
        Kelly and Mary O'Dell
        Case No.  CJ-2015-248
        In the District Court of Wagoner County
        State of Oklahoma
        Deposition Date:  04/18/17

30)     Charles and Kathleen Abbott v.
        NIBCO INC., Locke Supply and Preferred Total
        Mechanical & Plumbing
        In the District Court in and for Tulsa County
        State of Oklahoma
        Case No. CJ-2012-03217
        Deposition Date:  05/16/17

31)     Steven L. Holtsclaw v.
        BorgWarner Morse Tec, Inc., et al.,
        Superior Court of the State of California
        County of Los Angeles
        No.:  BC631830
        Deposition Date:  06/28/17

**EXHIBIT 23**

32)      Patrik C. McCall and Malinda McCall v.
           State Farm Fire and Casualty Company
           In the United States District Court for the
           Eastern District of Oklahoma
           Case No. 16-CIV-457-RAW
           Trial Testimony Date:  08/10/17

33)      Keith E. Best, et al v.
           Arthur S. Bridal, et al
           In the District Court of Logan County
           State of Oklahoma
           No.  CJ-2012-137
           Trial Testimony Date:  11/16/17

34)      Steven F. and Jean Lucas v.
           Charles J. Miller
           In the District Court of Lincoln County
           State of Oklahoma
           Case No.: CJ-2016-34
           Deposition Date:  12/07/17

35)      Leah Wiseman, personal Representative of
           The Estate of Jack Wiseman, deceased v.
           Choice Hotels International, Inc. and Idabel
           Hospitality, Inc. d/b/a Comfort Suites
           In the District Court of McCurtain County
           State of Oklahoma
           Case No. CJ-2015-106
           Deposition Date:  12/20/17

36)      Ronald Diaso, Sr., and Virginia Diaso v.
           CBS Corporation, et al
           Superior Court of the State of California
           For the County of Los Angeles
           Case No. BC661775
           Deposition Date:  01/11/18

37)      Michael Max v.
           Heritage Construction Corporation, an Oklahoma Corporation
           In the District Court in and for Tulsa County
           State of Oklahoma
           Case No. CJ-2008-832
           Deposition Date:  03/30/18

**EXHIBIT 23**

38)     Shelter Mutual Insurance Co. A/S/O
        Charles Givens and Laurie Givens v.
        Oklahoma Gas & Electric Co., Davis H. Elliot &
        CoxCom, LLC
        In the District Court of Oklahoma County
        State of Oklahoma
        Case No. CJ-17-2825
        Deposition Date:  4/09/18

39)     Stephen S. Hull, Ph.D and Kathryn E. Reilly, MD., v
        Michael A. Gilles and Gay Lynn Gilles
        In the District Court in and for Oklahoma County
        State of Oklahoma
        Case No. CJ-2009-7709
        Deposition Date:  4/23/18

40)     Precious Joiner v.
        Almonte Apartments, LLC dba Almonte Apartments;
        Almonte Company, LLC: dba Almonte Apartments; and
        Myan Management Group, LLC
        In the District Court of Oklahoma County
        State of Oklahoma
        Case No:  CJ-2015-2798
        Deposition Date:  4/24/18

41)     Jennifer Lin Cooper, et al. v.
        New Dominion, LLC, et al.
        In the District Court of Cleveland County
        State of Oklahoma
        Case No: CJ-2015-24
        Class Certification Hearing Date:  5/16/18

42)     Stephen S. Hull, Ph.D. and Kathryn E. Reilly M.D,
        Husband and Wife, v
        Michael A. Gilles and Gay Lynn Gilles, Husband and Wife
        In the District Court in and for Oklahoma County
        State of Oklahoma
        Case No:  CJ-2009-7709
        Trial Testimony Date:  05/24/18

43)     Lorine Mitchell v
        State Farm Fire and Casualty Company
        In the United States District Court for the
        Northern District of Mississippi Oxford Division
        Case No. 3:17-cv-170-MPM-RP
        Deposition Date:  06/07/18

**EXHIBIT 23**

44)   Jennifer Lee Allen v
      Tulsa Riverside Park, LLC d/b/a Riverside Park Apartments,Inc.
      A Domestic for Profit Limited Liability Company; and Gaines
      Investment Trust, Inc., a Foreign for Profit Corporation
      In the District Court in and for Tulsa County
      State of Oklahoma
      Case No. CJ-2015-3679
      Deposition Date:  06/29/18

45)   NEC Networks, LLC, d/b/a CaptureRx v
      Airport Center, LLP, Airport Center Office Building, LLP,
      Spectrum Building of Texas, LLP, S&H Realty Management, LLP
      And Le Pere Commercial Real Estate Services, LLC.
      Scott D. Elfstrom, Individually, Steve Heim, Individually, Chrissy Sells,
      Individually
      In the District Court 285th Judicial District Bexar County, Texas
      Cause No. 2017CI02470
      Deposition Date:  08/28/18

46)   Patrick Pete Stover, Sheri Lynn Stover v
      State Farm Fire & Casualty Company
      In the United States District Court for the
      Western District of Oklahoma
      Case No. CIV-17-1002-HE
      Deposition Date:  08/31/18

47)   Richard Mays and Sheri Mays, Individuals; and Mays Service, Inc.,
      An Oklahoma Corporation v
      Liberty Mutual Fire Insurance Company
      In the District Court of Cleveland County
      State of Oklahoma
      Case No. CJ-16-921
      Deposition Date:  09/25/18

**EXHIBIT 23**